IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

No. 13-7152
_____

DEANGELO MARQUIS WHITESIDE,

*Petitioner-Appellant*,

v.

UNITED STATES OF AMERICA,

*Respondent-Appellee.*
_____

Appeal from the United States District Court
for the Western District of North Carolina

*The Honorable Martin K. Reidinger, District Judge*

_____

PETITION FOR REHEARING EN BANC
_____

Anne M. Tompkins                     Amy E. Ray
United States Attorney               Assistant United States Attorney
                                     United States Courthouse
                                     Room 233
                                     100 Otis Street
                                     Asheville, North Carolina 28801
                                     (828) 271-4661

*Attorneys for the United States of America*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

STATEMENT OF REASONS FOR EN BANC CONSIDERATION ....................1

STATEMENT OF THE ISSUES....................................................................1

BACKGROUND AND PANEL DECISION ..........................................................2

I.    The panel's cognizability holding is erroneous and creates an
      inter-circuit conflict, warranting en banc consideration.................................6

II.   The panel's equitable-tolling holding is novel and ignores the structure
      and purpose of the governing statute...............................................9

III.  The issues in this case are of recurring importance, and this case
      squarely presents them...................................................................12

CONCLUSION ...........................................................................................15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Begay v. United States*, 553 U.S. 137 (2008) ..........................................................12

*Bousley v. United States*, 523 U.S. 614 (1998)........................................................9

*Carachuri-Rosendo v. Holder*, 560 U.S. 563 (2010)...............................................11

*Chambers v. United States*, 555 U.S. 122 (2009) ....................................................12

*E.J.R.E. v. U.S.*, 453 F.3d 1094 (8th Cir. 2006).......................................................14

*Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008) ......................................................9

*Hawkins v. United States*, 706 F.3d 820 (7th Cir. 2013),
    *supplemented on denial of reh'g*, 724 F.3d 915 (7th Cir. 2013) ....................7, 9

*Hawkins v. United States*, 724 F.3d 915 (7th Cir. 2013)..........................................9

*Hill v. United States*, 368 U.S. 424 (1962) ...............................................................6

*Holland v. Florida*, 560 U.S. 631 (2010)...................................................... 4, 9, 10

*Lo v. Endicott*, 506 F.3d 572 (7th Cir. 2007)...........................................................14

*Minter v. Beck*, 230 F.3d 663 (4th Cir. 2000).....................................................4, 10

*Peugh v. United States*, 133 S. Ct. 2072 (2013) ......................................................8

*Spencer v. United States*, 727 F.3d 1076 (11th Cir. 2013) .......................................8

*Sun Bear v. United States*, 644 F.3d 700 (8th Cir. 2011) .........................................8

*Timmreck v. United States,* 441 U.S. 780 (1979) ....................................................6

ii

*United States v. Addonizio*, 442 U.S. 178 (1979) ........................................6

*United States v. Mikalajunas*, 186 F.3d 490 (4th Cir. 1999) ....................13

*United States v. Pettiford*, 612 F.3d 270 (4th Cir. 2010)...........................6

*United States v. Powell*, 691 F.3d 554 (4th Cir. 2012) ..............................7

*United States v. Pregent*, 190 F.3d 279 (4th Cir. 1999) ............................6

*United States v. Rodriquez*, 553 U.S. 377 (2008) .....................................11

*United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011)...........................3

## **STATUTES**

18 U.S.C. § 3553(a) ..................................................................................15

18 U.S.C. § 3553(e) ....................................................................................2

21 U.S.C. § 841(a)(1)..................................................................................2

28 U.S.C. § 2255(a) ....................................................................................1

28 U.S.C. § 2255(f)(1) ................................................................................3

28 U.S.C. § 2255(f)(3) ...................................................................... 1, 2, 14

## **RULES**

U.S.S.G. § 2B1.1(b)(1) .............................................................................12

U.S.S.G. § 2L1.2(b)(1)(A) .......................................................................13

U.S.S.G. § 5K1.1........................................................................................2

## STATEMENT OF REASONS FOR EN BANC CONSIDERATION

The panel decision in this case includes two holdings that merit en banc reconsideration, because the issues involved are questions of exceptional importance and because the panel decision conflicts with this Court's prior case law and the decisions of other circuits. First, the panel held that a sentencing court's erroneous reliance on the career-offender guideline when sentencing a defendant under the advisory Sentencing Guidelines constitutes a "complete miscarriage of justice" and that a defendant so sentenced has a cognizable claim for initial collateral relief under 28 U.S.C. § 2255(a). Second, the panel held that the limitations period that ordinarily would have barred the late filing of Petitioner Deangelo Whiteside's motion to vacate should have been equitably tolled by the district court, even though Petitioner's motion relied on new case law that did not trigger the re-opening of the limitations period set forth in 28 U.S.C. § 2255(f)(3). These rulings are incorrect and are of significant and recurring importance, meriting en banc reconsideration.

## STATEMENT OF THE ISSUES

I.    Whether a misapplication of the advisory career-offender guideline results in a complete miscarriage of justice, permitting a petitioner so sentenced to assert a cognizable claim for initial collateral relief under 28 U.S.C. § 2255(a).

II.     Whether a district court is required to equitably toll the limitations period for the filing of an initial motion to vacate, where the petitioner relies on new case law but the right created was not initially recognized by the Supreme Court, as required to re-open the limitations period under 28 U.S.C. § 2255(f)(3).

## BACKGROUND AND PANEL DECISION

Petitioner pled guilty to possession with intent to distribute at least 50 grams of crack, in violation of 21 U.S.C. § 841(a)(1). J.A. at 9. The district court ultimately determined that Petitioner was a career offender, based on two prior North Carolina drug-trafficking convictions, resulting in an advisory Sentencing Guidelines range of 262 to 327 months in prison. Based on one of his prior drug-trafficking convictions, the district court also determined that Petitioner was subject to a statutory mandatory minimum of 20 years in prison. Prior to Petitioner's sentencing hearing, the Government filed a motion for downward departure based on Petitioner's substantial assistance to the Government and in accordance with Sentencing Guidelines § 5K1.1 and 18 U.S.C. § 3553(e), and the district court granted the Government's motion, sentencing Petitioner to 210 months in prison and entering its judgment on July 20, 2010. J.A. at 21-22. Petitioner did not appeal.

Nearly two years after the district court entered its judgment of conviction, on May 18, 2012, Petitioner filed a motion to vacate his sentence in light of this

2

Court's en banc decision in *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011), arguing that he did not qualify as a career offender and should not have been subject to a 20-year mandatory minimum, because neither of his prior convictions was for an offense punishable by at least one year in prison. *Id.* at 28, 31. The district court denied and dismissed Petitioner's motion to vacate, and Petitioner appealed.[1]

In a divided opinion, the panel in this case vacated the district court's judgment and remanded for resentencing. Add. A. The panel held that the one-year limitations period under 28 U.S.C. § 2255(f)(1) that ordinarily would bar Petitioner's motion to vacate as untimely should be equitably tolled, because the erroneous application of the career-offender enhancement "worked a gross miscarriage of justice" and because the futility of Petitioner's filing a motion to vacate before this Court's decision in *Simmons* constitutes an extraordinary circumstance that warrants equitable consideration. *Id.* at 9. Although acknowledging this Court's precedent establishing that the futility of a petitioner's claim does not constitute an impediment external to his own control, *id.* at 11; *see*

---

1 Although Petitioner challenged the application of a mandatory minimum sentence, as well as the career-offender enhancement, in the district court, he did not assert a challenge to the mandatory minimum as a basis for relief on appeal, instead explicitly declining to address the mandatory-minimum error and acknowledging that his sentence was based on the career-offender guideline range, not the mandatory minimum. *See* Pet. Br. at 4 n.1.

3

*also Minter v. Beck*, 230 F.3d 663, 666 (4th Cir. 2000), the panel concluded that the Supreme Court's more recent holding in *Holland v. Florida*, 560 U.S. 631 (2010), requires that the Court consider futility on a case-by-case basis, *id.* at 12. Stating that "the timing of [the Court's] decisions should not be the sole determinant of a petitioner's access to justice," the panel held that the limitations period should be tolled so that Petitioner could present his claim for relief. *Id.* at 13.

On the merits, the panel held that an erroneous application of the advisory career-offender guideline amounts to a fundamental miscarriage of justice that is cognizable on collateral review. Add. A at 21. The panel acknowledged that the ordinary misapplication of the Guidelines does not amount to a miscarriage of justice, *id.* at 15, but concluded that the erroneous application of the career-offender enhancement is not an ordinary error, *id.* at 21, 24. The panel recognized that its decision conflicts with decisions from the Seventh and Eighth Circuits and that the Eleventh Circuit's decision with which it was consistent had recently been vacated pending a rehearing en banc. *Id.* at 17-19.

Judge Wilkinson dissented, noting that the panel opinion "creates a square circuit conflict" over whether an error in the application of the advisory career-offender guideline is cognizable in a § 2255 motion to vacate. Add. A at 37.

Judge Wilkinson noted that, even if Petitioner's case were remanded for resentencing, the district court would be "perfectly free to impose the exact same sentence" and that the panel failed to explain why an advisory career-offender error is sufficiently extraordinary to constitute a miscarriage of justice, when "[e]very Guidelines calculation may affect the sentencing range to a greater or lesser degree." *Id.* at 47. Judge Wilkinson also disagreed with the panel's decision to equitably toll the statute of limitations, explaining that nothing in *Holland* undermined the central holding in this Court's decision in *Minter* that futility is not a valid justification for filing an untimely petition and noted that any allegation that Petitioner could not file his motion to vacate in a timely fashion "would be frivolous given the many defendants who filed suit prior to *Simmons* asserting the exact same substantive claim." *Id.* at 60-61. Finally, Judge Wilkinson emphasized that "one of the casualties of expanded collateral review is the finality of criminal convictions" and that "the evisceration of the finality principles imposes costs," many of which are born by the judicial system. *Id.* at 63. Judge Wilkinson concluded that the panel's decision is "wholly wrong and deeply damaging." *Id.* at 69.

**I.    The panel's cognizability holding is erroneous and creates an inter-circuit conflict, warranting en banc consideration.**

The Supreme Court has long held that a claim of error that is neither jurisdictional nor constitutional is not cognizable in a motion under § 2255(a), unless it involves "a fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure."   *Timmreck* v. *United States*, 441 U.S. 780, 784 (1979); *Hill* v. *United States*, 368 U.S. 424, 428 (1962). Applying this rule, this Court has described cognizable non-constitutional claims as those "involving a claim of 'error of fact or law of the "fundamental" character that renders the entire proceeding irregular and invalid.'" *United States v. Pettiford*, 612 F.3d 270, 278 (4th Cir. 2010) (quoting *United States v. Addonizio*, 442 U.S. 178, 186 (1979)). And, this Court has explicitly held that, "[b]arring extraordinary circumstances, . . . an error in the application of the Sentencing Guidelines cannot be raised in a § 2255 proceeding." *United States v. Pregent*, 190 F.3d 279, 283-84 (4th Cir. 1999).

Contrary to the panel's analysis, an advisory Guidelines calculation error is not an error so fundamental in character that it renders the entire proceeding irregular and invalid. Although the misapplication of the career-offender guideline in this case resulted in an advisory Guidelines range higher than the range that would have applied in the absence of the error, even without the

6

Guideline-calculation error, the district court possessed both the statutory authority and the discretion to impose the sentence it imposed, which was well below the advisory range and unfettered by any statutory minimum sentence. Indeed, were this case remanded and Petitioner resentenced, the district court could properly impose the same sentence. But, whether or not the district court would have imposed the same sentence is beside the point; the inquiry is an objective one that asks whether the court exercising discretion within the same statutory range *could* have reimposed the same sentence, not whether a particular judge *would* have done so. Thus, in *United States v. Powell*, 691 F.3d 554 (4th Cir. 2012), in which this Court held that *Carachuri-Rosendo* is not retroactively applicable on collateral review, Judge King dissented in part but concurred in the judgment because the petitioner in that case had not received an illegal sentence, noting, in part, that under this Court's precedent, defendants improperly sentenced as career offenders have no claim for relief under § 2255. *Powell*, 691 F.3d at 563 n.2 (King, J., dissenting in part and concurring in the judgment in part).

The conclusion that an advisory Guidelines error is cognizable on collateral review squarely conflicts with a decision of the Seventh Circuit and is supported by no other circuit's decision. *See Hawkins v. United States*, 706 F.3d 820, 824 (7th Cir. 2013), *supplemented on denial of reh'g*, 724 F.3d 915 (7th Cir. 2013),

7

*cert. denied*, 134 S. Ct. 1280 (2014). Indeed, the Eighth Circuit has held that a mandatory career-offender guideline error is not cognizable, *Sun Bear v. United States*, 644 F.3d 700, 705-06 (8th Cir. 2011) (involving mandatory career offender errors), and thus necessarily would preclude relief for an advisory career-offender error. And, the sole panel decision to reach the same conclusion as the majority here has been vacated on the grant of rehearing en banc. *See Spencer v. United States*, 727 F.3d 1076, 1087 (11th Cir. 2013). The panel thus stands alone in holding that an advisory career-offender-guideline error is cognizable on collateral review.

The panel's reliance on the Supreme Court's decision in *Peugh v. United States*, 133 S. Ct. 2072 (2013), in which the Court found an ex post facto violation in applying the advisory Guidelines range in effect at the time of sentencing when the range in effect when the defendant committed the crime was lower, is misplaced. *Id.* at 2084. *Peugh*'s holding that a constitutional error in calculating the advisory Guidelines range can invalidate a sentence on direct review does not imply that a nonconstitutional error in calculating the advisory Guidelines range is cognizable on collateral review. The panel's heavy reliance on *Peugh* is misplaced, because *Peugh* says nothing about post-conviction relief or where Congress chose to strike the balance between finality and error-free proceedings. The Supreme

8

Court's decisions in *Timmreck* and *Hill* squarely address that issue, however, as do this Court's decisions in *Pregent* and *Pettiford*. Those decisions compel the conclusion that Petitioner's lawful, if erroneous, sentence is not a complete miscarriage of justice and does not render his entire prosecution irregular and invalid, particularly where he could receive the same sentence within the same statutory range, even in the absence of the Guideline-calculation error. *See Hawkins*, 724 F.3d at 917.

## II.  The panel's equitable-tolling holding is novel and ignores the structure and purpose of the governing statute.

A petitioner is entitled to the equitable tolling of his post-conviction motion only if he shows (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way and prevented timely filing. *Holland*, 560 U.S. at 649; *see also Green v. Johnson*, 515 F.3d 290, 304 (4th Cir. 2008) (noting that equitable tolling of post-conviction statute of limitations is available only "in those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." (citation and internal quotation marks omitted). Just as the Supreme Court has recognized in the context of procedural default that "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time," *Bousley v.*

*United States*, 523 U.S. 614, 623 (1998) (citation and internal quotation marks omitted), so, too, this Court has explained the difference between an "impediment," or an obstruction hindering an effort, and "futility," or the unsuccessful result of an effort already undertaken, *Minter*, 230 F.3d at 666. While an impediment to the timely filing of a post-conviction motion may warrant equitable tolling, the mere futility of filing such a motion may not.    *Id.* at 666-67.

In holding that the limitations period should be equitably tolled in this case, the panel side-stepped this Court's plain language in *Minter* that made clear that futility is not a sufficient basis to support the equitable tolling of the AEDPA limitations period, stating that this Court decided *Minter* before the Supreme Court issued its opinion in *Holland*. Add. A at 11. But, *Holland* and *Minter* both require a circumstance external to the petitioner that is extraordinary and "prevented timely filing." *Holland*, 560 U.S. at 649; *Minter*, 230 F.3d at 666-67. Thus, while *Holland* rejected a blanket rule that an attorney's error could only support equitable tolling if the attorney acted in bad faith, *Holland*, 560 U.S. at 634, the Court retained the requirement, ordinarily applicable, that an extraordinary circumstance have stood in the way of a petitioner's timely filing of his post-conviction motion, *id.* at 649. Adverse case law may discourage a petitioner from filing a post-conviction motion, but it is not an extraordinary circumstance that stands in the way of such a

10

petitioner, and the panel's holding to the contrary broadens the application of equitable tolling beyond limits previously established by both this Court and the Supreme Court.

This case illustrates the dramatic impairment of finality from the panel's expansive revision of equitable tolling doctrine. This Court's decision in *Simmons* was presaged by several court decisions, two of them issued by the Supreme Court well before Petitioner's judgment became final. Specifically, *United States v. Rodriquez*, 553 U.S. 377 (2008), and *Carachuri-Rosendo v. Holder*, 560 U.S. 563 (2010), were both issued before Petitioner's judgment became final and more than a year before the one-year limitations period ran. Particularly after *Carachuri-Rosendo*, the legal issue that Petitioner now raises was well known and often raised. And, if the existence of these decisions alone were not enough to make clear that Petitioner could have sought *Simmons* relief within the applicable limitations period, the fact that so many criminal defendants presented Petitioner's claim for relief well before this Court issued its en banc *Simmons* decision establishes that no extraordinary circumstance prevented Petitioner's doing so. *See* Add. A at 61 (Wilkinson, J., dissenting) (citing examples of defendants who asserted the same substantive claim Petitioner now asserts before *Simmons* was decided, including Jason Simmons himself).

11

**III.   The issues in this case are of recurring importance, and this case squarely presents them.**

Whether errors in the calculation of the advisory Guidelines range are redressable on collateral review is an issue of prospective and recurring importance. In the wake of *Begay v. United States*, 553 U.S. 137 (2008), and *Chambers v. United States*, 555 U.S. 122 (2009), federal prisoners filed a large number of applications for collateral relief seeking relief for advisory Guidelines errors. That number has been dwarfed in this circuit by prisoners seeking relief in the aftermath of *Simmons*. The panel's decision not only opens wide the collateral-review door for career-offender errors, even in the era of advisory Guidelines, but its equitable-tolling holding also permits petitioners asserting such *Simmons* errors to do so many years after their convictions have become final.

In addition to creating a circuit split and expanding the boundaries of cognizability in § 2255 proceedings, the panel's decision fails to provide any standard for determining cognizability of Guideline-calculation errors in the future. While the panel describes the career-offender error as "extraordinary," the magnitude of a career-offender error can differ dramatically between defendants, and there are numerous other Guideline enhancements that also can result in a dramatically higher advisory range. *See*, *e.g.*, U.S.S.G. § 2B1.1(b)(1) (loss amount in fraud cases can result in enhancement of up to 30 levels); U.S.S.G.

12

§ 2L1.2(b)(1)(A) (16-level increase for certain illegal-reentry offenses).[2] Having provided no means of distinguishing between a non-cognizable Guideline error and a cognizable-because-extraordinary Guideline error, the panel decision risks opening the floodgates to many more prisoner petitions and, at the same time, leaves district courts guessing as to what constitutes an error sufficiently extraordinary to warrant § 2255 relief. Additionally, because the panel's reasoning blurs the distinction between ordinary error and a complete miscarriage of justice by treating a procedurally unreasonable sentence—*i.e.*, a sentence imposed after calculation of an erroneous advisory Guidelines range—as equivalent to a complete miscarriage of justice, the decision enables the use of collateral review to correct errors that both this Court and the Supreme Court have previously reserved for direct appeal. The panel's decision, then, materially alters the scope of collateral review, warranting reconsideration.

---

2 In *United States v. Mikalajunas*, 186 F.3d 490 (4th Cir. 1999), this Court held that the actual-innocence exception to procedural default may apply "in non-capital sentencing only in the context of eligibility for application of a career offender or other habitual offender guideline provision," thus distinguishing between recidivism-based enhancements and Guideline errors that are not related to recidivism enhancements. *Id.* at 495. Although *Mikalajunas* addresses procedural default and not cognizability, this distinction between the erroneous application of recidivism enhancements and the erroneous application of other types of enhancements may help cabin the apparent breadth of the panel's holding. But, as the panel did not articulate any limitation defining cognizable Guideline errors—other than that they must be "extraordinary"—it is not clear whether *Mikalajunas* effectively limits the panel's holding.

13

The panel's equitable-tolling holding similarly undermines finality. It conflicts with the structure of the AEDPA statute-of-limitations provision, which explicitly defines when new legal authority resets the limitations period and restricts the resetting of the clock to new Supreme Court decisions made retroactively applicable on collateral review. *See* 28 U.S.C. § 2255(f)(3). Because Congress delineated in § 2255(f)(3) the category of court decisions that may, because they alter the legal landscape, reset the limitations period and did not include in that category any decision by a circuit court of appeals, equitably tolling the limitations period based on a new circuit court decision destabilizes the statute-of-limitations framework established by Congress. *See Lo v. Endicott*, 506 F.3d 572, 576 (7th Cir. 2007) (explaining that equitable tolling may apply to time limits established by AEDPA "but only where the judge-made doctrine does not conflict with the express tolling provisions"); *E.J.R.E. v. U.S.*, 453 F.3d 1094, 1098 (8th Cir. 2006) (explaining that Congress "impliedly rejected the notion that . . . decisions taken from the courts of appeals . . . , could trigger any of the limitations periods enumerated under § 2255"). Given the extraordinary number of post-conviction motions that have been filed seeking relief under *Simmons*, the panel's decision requiring equitable tolling for any defendant who filed his motion to vacate within a year of *Simmons* will function to throw the collateral-review

14

doors open still wider.   And, as Judge Wilkinson explains in his dissent, these holdings do so at the expense of "retroactivity doctrines that have long safeguarded the basic finality of criminal convictions." Add. A at 35.

Finally, this case merits en banc reconsideration because it squarely presents both the cognizability issue and the equitable-tolling issue.[3]   The panel justified the application of equitable tolling, in part, on its determination that the advisory career-offender error "worked a gross miscarriage of justice," Add. A at 9, while Judge Wilkinson described the cognizability issue in dissent as "both a primary and threshold issue," *id.* at 37. Both issues are, therefore, fully presented, and as both are of recurring importance, they are both appropriate for reconsideration by the full court.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that this Court grant its petition for rehearing en banc.

---

3 The panel rested its holding entirely on the advisory Guidelines error, and not on the mandatory-minimum error (which Petitioner waived). The Government notes that, even if Petitioner had not waived his claim of error based on the misapplication of the statutory mandatory minimum in this case, he would not be entitled to relief based solely on that error. Although the Government has waived the statute of limitations and acceded to relief in certain cases in which the petitioner was sentenced based on an improperly applied mandatory minimum, the Government would not have done so in this case, because the district court was able to sentence Petitioner below the mandatory minimum based on the Government's motion for downward departure and, in doing so, explicitly considered the sentencing factors enumerated in 18 U.S.C. § 3553(a).   *See* Sentencing Tr., Doc. 32, at 16-17.

15

Respectfully submitted, this the 6th day of June, 2014.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY
s/Amy E. Ray
Amy E. Ray
NC Bar Number #22762
Assistant United States Attorney
U.S. Courthouse, Room 233
100 Otis Street
Asheville, North Carolina 28801
Telephone: (828) 271-4661
Fax: (828) 271-4670
E-mail: Amy.Ray@usdoj.gov

# <u>CERTIFICATION OF COMPLIANCE</u>

1.    This Brief has been prepared using (select and complete only one):

__x__ Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT sans serif typeface such as Arial).   Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point): <u>WordPerfect X4, Century Schoolbook, 14 point</u>

_____ Twelve point, monospaced typeface (such as Courier or Courier New). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier 12 point):

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains (select and complete only one):

3._____  Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

_3524__ Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

_____  Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.   If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

s/Amy E. Ray
Assistant United States Attorney
USAO Asheville, NC

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day served a copy of the above upon Defendant herein by serving his attorney of record, Ann L. Hester, through electronic case filing.

This the 6th day of June, 2014.

s/Amy E. Ray
Assistant United States Attorney
USAO Asheville, NC

**ADDENDUM A**

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-7152**

---

DEANGELO MARQUIS WHITESIDE,

               Petitioner - Appellant,

     v.

UNITED STATES OF AMERICA,

               Respondent - Appellee.

---

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, District Judge.  (1:09-cr-00069-MR-1; 1:12-cv-00118-MR)

---

Argued:  January 29, 2014           Decided:  April 8, 2014

---

Before WILKINSON and GREGORY, Circuit Judges, and DAVIS, Senior Circuit Judge.

---

Vacated and remanded for resentencing by published opinion. Judge Gregory wrote the majority opinion, in which Senior Judge Davis joined.  Senior Judge Davis wrote a separate concurring opinion, and Judge Wilkinson wrote a dissenting opinion.

---

**ARGUED**: Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF**: Henderson Hill, Executive Director, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Anne M. Tompkins, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

GREGORY, Circuit Judge:

This case presents the question of whether a federal inmate may use a 28 U.S.C. § 2255 motion to challenge a sentence that was based on the career offender enhancement under the United States Sentencing Guidelines when subsequent case law reveals the enhancement to be inapplicable to him. We find that he may, and in doing so hold that the mistake results in a fundamental miscarriage of justice that is cognizable on collateral review. For the reasons stated below, we grant a certificate of appealability, vacate the petitioner's sentence, and remand the case for resentencing.

I.

The facts relevant to this appeal are brief and largely undisputed. In July 2009, the petitioner-appellant, Deangelo Whiteside, was indicted on charges of possession with intent to distribute at least 50 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). Shortly thereafter, the government filed an Information pursuant to 21 U.S.C. § 851 notifying Whiteside that it intended to seek an enhanced penalty based on a 2002 North Carolina felony drug conviction.

Whiteside then entered into a plea agreement with the government. The agreement acknowledged the possibility that Whiteside might be designated a career offender under U.S.S.G.

2

§ 4B1.1.    It also contained several waivers of Whiteside's rights to challenge his conviction and sentence in an appeal or collateral proceeding.  As discussed in more detail below, the parties dispute whether these provisions bar Whiteside's current claim.

Whiteside pled guilty to the offense in October 2009 and the probation office began preparing a presentence report.  The probation officer concluded that Whiteside was responsible for 1,951.9 grams of powder cocaine and 468.3 grams of crack cocaine, generating a base offense level of 32.[1]  The probation officer also determined that a 1999 North Carolina conviction for felony possession with intent to sell and deliver cocaine, along with the 2002 drug conviction, qualified Whiteside for the career offender enhancement under § 4B1.1.[2]  The enhancement

---

[1]  The probation officer disagreed with the government's stipulation in the plea agreement that Whiteside would be held responsible for more than 50 and less than 150 grams of crack cocaine.

[2]  The career offender enhancement defines a "career offender," and provides that a defendant is such an offender if

(1) [he] was at least eighteen years old at the time [he] committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) [he] has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a).  For purposes of the enhancement, a "prior felony conviction" includes "a prior . . . state conviction for (Continued)

3

raised Whiteside's base offense level to 37 and his criminal history category from V to VI.  After a three-level reduction for acceptance of responsibility, Whiteside's Sentencing Guidelines range was 262 to 327 months in prison.  In light of the government's § 851 Information, the prior felony drug convictions also subjected Whiteside to a mandatory minimum term of imprisonment of twenty years.

Prior to Whiteside's sentencing hearing, the government filed a § 5K1.1 motion seeking a downward departure based on the petitioner's substantial assistance.  The government recommended that Whiteside receive a sentence based on a total offense level of 32 and a criminal history category VI, which yielded a 210 to 262 month Guidelines range.  The district court granted the government's motion and, on July 9, 2010, sentenced Whiteside to 210 months' imprisonment, a sentence below both his Guidelines range and the twenty-year mandatory minimum.

On August 17, 2011, this Court issued its en banc decision in United States v. Simmons, 649 F.3d 237 (4th Cir. 2011).  In Simmons, we overruled circuit precedent and held that a North Carolina conviction is a crime punishable by a term of

---

an offense punishable by . . . imprisonment for a term exceeding one year, regardless of whether such offense is specifically designated as a felony." Id. § 4B1.2 cmt. n.1.

4

imprisonment exceeding one year only when the defendant's particular criminal history and the nature of his offense so warrant. <u>See</u> <u>id.</u> at 247 & n.9. It is undisputed that under <u>Simmons</u>, Whiteside's predicate convictions were not punishable by more than a year in prison, and were he sentenced today he would not be subject to either the career offender enhancement or the twenty-year statutory minimum penalty.

Whiteside argues that without those enhancements he would have faced a Guidelines range of 140 to 175 months and a statutory term of ten years to life. Assuming the same downward departure based on substantial assistance – eighty percent of the low end of the Guidelines – Whiteside contends that his sentence would have been 112 months, roughly eight years shorter than the sentence he received.

On May 18, 2012, Whiteside filed a 28 U.S.C. § 2255 motion to vacate his sentence. He argued that, in light of <u>Simmons</u>, he did not qualify as a career offender and that he should be resentenced without the enhancement.[3] The district court dismissed Whiteside's motion to vacate, concluding that it was untimely, that Whiteside waived his right to collaterally attack

---

[3] Whiteside subsequently filed a supplement to his motion to vacate, making the same arguments, but seeking, in the alternative, relief under 28 U.S.C. § 2241, a writ of coram nobis, and a writ of audita querela.

5

his sentence in his plea agreement, and that he was not eligible
for post-conviction relief because he received a sentence
beneath the statutory maximum.  The district court also declined
to issue a certificate of appealability.  This appeal followed.

II.

A.

We must first address whether Whiteside's motion to vacate
is procedurally barred.  The first question on this point is
whether Whiteside in his plea agreement waived his right to
collaterally attack his sentence.  We review this issue de novo.
See United States v. Copeland, 707 F.3d 522, 528 (4th Cir.
2013).

The relevant portions of Whiteside's plea agreement are as
follows:

> 20.  Defendant, in exchange for the concessions made
> by the United States in this plea agreement,
> waives all such rights to contest the conviction
> except for: (1) claims of ineffective assistance
> of counsel or (2) prosecutorial misconduct.
> Defendant also . . . knowingly and expressly
> waives all rights conferred by 18 U.S.C. § 3742
> or otherwise to appeal whatever sentence is
> imposed with the two exceptions set forth above.
> Defendant also reserves right to appeal ruling as
> to career offender pursuant to USSG § 4Bl.l.

> 21.  Also, in exchange for the concessions made by the
> United States, defendant agrees that the United
> States preserves all its rights and duties with
> respect to appeal as set forth in 18 U.S.C.
> § 3742(b), while the defendant waives all rights

6

to appeal or collaterally attack the sentence of
conviction with the two exceptions set forth
above.

The government contends that under these terms, Whiteside
waived his right to collaterally attack his sentence on all
grounds except that of ineffective assistance of counsel or
prosecutorial misconduct. We disagree, finding that the
language of the plea agreement is ambiguous and does not clearly
specify which rights were waived.

In short, the paragraphs quoted above contradict one
another. Paragraph 20 states that the defendant may challenge
his conviction only on the two grounds just mentioned. It goes
on to state that the defendant retains his right to appeal his
sentence with respect to the career offender enhancement.
However, paragraph 21 then states that he may only challenge his
sentence (through either a direct appeal or § 2255 motion) on
ineffective assistance or prosecutorial misconduct grounds.
This simply does not make sense. Either the parties intended to
limit the defendant's right to challenge his sentence to two
grounds, a result which would render the career offender
reference at the end of paragraph 20 superfluous, or the
statement in paragraph 21 limiting Whiteside's rights to
challenge his sentence to two grounds was a mistake and should
instead have cited three possible bases for a challenge. Either
reading is problematic, leaving it impossible to say exactly

7

which rights Whiteside waived. When a plea agreement is unclear, it must be construed against the government. See United States v. Jordan, 509 F.3d 191, 199-200 (4th Cir. 2007). As such, we hold that Whiteside did not waive his right to challenge the career offender enhancement in a collateral proceeding.

B.

We next consider whether Whiteside's motion to vacate was timely. A § 2255 petitioner ordinarily has one year from the date on which his conviction becomes final in order to file a motion to vacate. 28 U.S.C. § 2255(f)(1). Whiteside's conviction became final on August 17, 2010, but he did not file his motion until May 18, 2012, well beyond the one-year period. However, the statute of limitations in § 2255(f)(1) may be equitably tolled in certain circumstances. Specifically, equitable tolling applies if the petitioner can show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). Relief is limited to cases "where – due to circumstances external to the party's own conduct – it would be unconscionable to enforce the limitation period against the party and gross injustice

8

would result." United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004).

As explained below, we find that the erroneous application of the career offender enhancement worked a gross miscarriage of justice. We also hold that Whiteside pursued his rights diligently by filing his motion within a year of our decision in Simmons and that extraordinary circumstances prevented him from filing the motion earlier. Our decision is based on the simple fact that our case law prior to Simmons absolutely foreclosed Whiteside's current argument. In United States v. Jones, 195 F.3d 205 (4th Cir. 1999), and then again in United States v. Harp, 406 F.3d 242 (4th Cir. 2005), we rejected the arguments that we later accepted in Simmons. Had Whiteside filed a habeas petition prior to Simmons it would have been summarily denied on the basis of these decisions, as was the case for numerous other petitioners. See, e.g., Robinson v. United States, No. 5:07-cv-140, 2011 WL 676184 (E.D.N.C. Feb. 18, 2011); Jordan v. United States, No. 1:09-cv-816, 2010 WL 2347076 (M.D.N.C. June 3, 2010). We think this condition – the complete lack of any chance at success – constitutes an "extraordinary circumstance" that warrants equitable considerations. The obstacle was clearly external to Whiteside – indeed, it was our incorrect interpretation of which North Carolina convictions support the career offender enhancement that prevented him from seeking

9

relief.    Once  this  was  corrected  and  Whiteside  had  an

opportunity  for  meaningful  review,  he  filed  his  motion  in  a

timely  manner.    This  is  not  a  case  of  a  petitioner  who  has  slept

on  his  rights  and  later  seeks  relief  from  his  indolence;

instead,  once  Whiteside's  right  to  review  obtained  any  real

significance,  he  acted.

The  government  nevertheless  contends  that  Whiteside  should

have  filed  his  petition  prior  to  Simmons  in  spite  of  its  sure

defeat.    In  addition  to  simply  having  an  air  of  absurdity  about

it,  this  argument  would  lead  to  the  perverse  result  of  reading

the  AEDPA's  time  limitations  to  encourage  inmates  to  flood  the

courts  with  baseless  petitions  on  the  off  chance  that  the  law

might  one  day  change.    Further,  if  Whiteside  had  filed  his

petition  prior  to  Simmons  and  it  had  been  denied,  his  current

claim  would  possibly  be  barred  as  a  successive  petition.    See

§ 2255(h).[4]    Given  the  timing  of  Whiteside's  conviction  and  our

decision  in  Simmons,  the  result  of  the  government's  position  is

that  at  no  point  would  Whiteside  have  been  entitled  to  relief

---

[4] We  expressly  do  not  decide  whether  the  savings  clause  in
§ 2255(e)  might  justify  relief  from  a  Simmons  sentencing  error
through  the  filing  of  a  § 2241  petition.    While  we  have  not
previously  "extended  the  reach  of  the  savings  clause  to  those
petitioners  challenging  only  their  sentence,"  United  States  v.
Poole,  531  F.3d  263,  267  n.7,  274  (4th  Cir.  2008),  we  note  that
the  Eleventh  Circuit  recently  permitted  a  federal  inmate  to  use
§ 2255(e)  to  bring  a  § 2241  petition  challenging  the  legality  of
his  sentence.    Bryant  v.  Warden,  738  F.3d  1253  (11th  Cir.  2013).

from an error that we consider to be a fundamental miscarriage of justice. We cannot accept such an outcome.

Nor are we bound to. We recognize that we previously held that the futility of a petitioner's claim does not constitute a circumstance external to his control. Minter v. Beck, 230 F.3d 663, 666 (4th Cir. 2000). However, our decision in Minter preceded the recent Supreme Court decision in Holland, which adopted an expansive reading of the role of equity in habeas cases. In Holland, the Supreme Court reviewed an Eleventh Circuit rule holding that attorney negligence in failing to meet a filing deadline may never serve as a basis for equitable tolling absent a showing of bad faith or dishonesty on the part of the attorney. 560 U.S. at 644. The Court rejected this rule as overly rigid. Noting equity's longstanding role in habeas relief, the Court stated that principles of equitable tolling are consistent with the "AEDPA's basic purpose of eliminating delays . . . without undermining basic habeas corpus principles and by harmonizing the statute with prior law, under which a petition's timeliness was always determined under equitable principles." Id. at 648. In light of this, the Court held that the AEDPA's statutes of limitations "do[] not set forth 'an inflexible rule requiring dismissal whenever' its 'clock has run.'" Id. at 645 (quoting Day v. McDonough, 547 U.S. 198, 205 (2010)). The Court further explained that, while courts of

11

equity are of course governed by "rules and precedents," equity also requires "flexibility" and the avoidance of "mechanical rules." Id. at 649-50 (internal quotation marks and citations omitted); see also id. at 650 (courts must "exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case").

Although Holland dealt with attorney misconduct, an issue not before this Court, the decision's broader point was that the "exercise of a court's equity powers . . . must be made on a case-by-case basis . . . ." Id. at 649-50; see also Jones v. United States, 689 F.3d 621, 626-28 (6th Cir. 2012) (citing Holland and applying equitable tolling where inmate filed petition within three months of Supreme Court's decision in Begay v. United States, 553 U.S. 137 (2008), entitling him to relief). To the extent Minter created a bright-line rule that futility may not constitute an extraordinary circumstance, Holland requires that we at least apply such a rule on a case-by-case basis.[5]

_____

[5] Moreover, the factual differences in the cases aside, our outcome is entirely consistent with Holland. Indeed, the circumstances here are arguably more compelling, given that attorney errors are generally attributable to clients, see Holland, 560 U.S. at 656 (Alito, J., concurring) (citation omitted), while this case deals with our own error in (Continued)

When examining the particular circumstances of Whiteside's case, we find that he satisfies the requirements necessary for equitable tolling. He has successfully demonstrated that his sentence amounted to a fundamental miscarriage of justice. Correcting unjust incarcerations is the whole purpose of § 2255. As the Supreme Court explained in Holland, the AEDPA's time limitations do not foreclose this relief to all those who are unable to meet the statute's deadlines. Had Whiteside filed within the one-year statute of limitations, he likely would have been forced to suffer the injustice with no future chance at relief. The timing of our decisions should not be the sole determinant of a petitioner's access to justice. Whiteside's inability to obtain meaningful relief prior to our decision in Simmons is an extraordinary circumstance that warrants some flexibility on our behalf in order "to accord all the relief necessary to correct . . . particular injustices." Id. at 650 (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 248 (1944)).[6] Accordingly, we equitably toll the limitations period and review Whiteside's claim.

---

interpreting prior case law. There is no similar justification for punishing a petitioner for our mistake.

    [6] Indeed, even the government recognizes that on a case-by-case basis, Simmons relief should be afforded to some (Continued)

III.

Turning to the merits of the case, we are asked to decide whether a petitioner may challenge his sentence on collateral review based on an incorrect application of the career offender enhancement. Because it is the only response that is both consistent with the realities of federal sentencing and just, we answer yes.

Section 2255 allows federal prisoners to move to set aside sentences that are imposed "in violation of the Constitution or laws of the United States." Thus, § 2255 relief is not limited to constitutional errors. See Davis v. United States, 417 U.S. 333, 345-56 (1974). However, a non-constitutional error may only serve as a basis for collateral attack when it involves "a fundamental defect which inherently results in a complete

_____

petitioners notwithstanding limitations or appeal waivers. See Mungro v. United States, Nos. 5:11-cv-141-RLV & 5:04-cr-18-RLV-CH-1, 2013 WL 6800822, at *6-*7 & n.3 (W.D.N.C. Dec. 23, 2013) (granting § 2255 motion to vacate the prisoner's mandatory life sentence on Simmons grounds, and noting that the government had waived "reliance on the statute-of-limitations defense"); Sturvidant v. United States, Nos. 3:12-CV-66-FDW & 3:09-cr-39-FDW-6, 2013 WL 6669025, at *1, *3 (W.D.N.C. Dec. 18, 2013) (granting Simmons relief after government "declined to enforce" the defendant's plea-agreement waiver of the right to collaterally attack his sentence). As the government apparently concluded in Mungro, we conclude that in this case "it would be unconscionable to enforce the limitation period against the [petitioner] and gross injustice would result" were we to do so. Minter, 230 F.3d at 667 (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000) (§ 2254 case)).

14

miscarriage of justice." <u>United States v. Addonizio</u>, 442 U.S. 178, 185 (1979) (internal quotation marks omitted). The Supreme Court has provided only the general contours of what constitutes a complete miscarriage of justice. For example, in <u>Hill v. United States</u>, 368 U.S. 424, 429 (1962), the Court reviewed a sentencing judge's failure to inform a defendant that he had the right to speak at his sentencing hearing. The Court characterized this mistake as a mere failure to follow the formal requirements of a rule, and held that it did not constitute a basis for habeas relief. <u>Id.</u>; <u>see also</u> <u>Peguero v. United States</u>, 526 U.S. 23 (1999) (failure to inform defendant of the right to appeal where defendant knew of the right); <u>United States v. Timmreck</u>, 441 U.S. 780 (1979) (failure to mention a special parole term at Rule 11 hearing). In contrast, in <u>Davis</u> the Court held that a post-conviction change in the law that rendered the defendant's conduct no longer criminal is correctable on collateral review because "[t]here can be no doubt that such a circumstance inherently results in a complete miscarriage of justice . . . ." 417 U.S. at 346 (internal quotation marks omitted).

Like a number of our sister circuits, we have held that "ordinary misapplication of the guidelines does not amount to a miscarriage of justice." <u>United States v. Mikalajunas</u>, 186 F.3d 490, 496 (4th Cir. 1999) (collecting cases); <u>see also</u> <u>United</u>

15

States v. Pregent, 190 F.3d 279, 283-84 (4th Cir. 1999).
However, we have not offered a considered explanation of what
constitutes an "ordinary" Guidelines error as opposed to
something more fundamental.   In Mikalajunas, we held that an
improper two-level enhancement for restraint of the victim did
not amount to a complete miscarriage of justice.   186 F.3d at
496.    In Pregent, we considered whether a defendant whose
criminal history had been wrongly calculated resulting in a
sentence four months too long was entitled to seek relief from
the supervised release portion of his sentence.   190 F.3d at 283
& n.4.   Although we assumed that the error was cognizable on
collateral review, we dismissed the defendant's claim as
untimely.   We have not had occasion to address the specific
issue presented in this case:   whether the career offender
enhancement is so significant that its improper application
amounts to a fundamental miscarriage of justice.[7]

---

[7] Our friend in dissent accuses us of running "roughshod"
over circuit precedent.   This is demonstrably not the case.
Aside from the fact, explained below, that the career offender
enhancement is plainly not a run-of-the-mill guideline, the
dissent ignores the particulars of our prior cases.   In United
States v. Pettiford, 612 F.3d 270, 275 (4th Cir. 2010), the
petitioner filed a motion to vacate his Armed Career Criminal
Act enhanced sentence following a state court vacatur of two of
his predicate offenses.   We denied the motion because it was
undisputed that, following the vacatur, the petitioner still had
three remaining ACCA qualifying convictions in his record.   Id.
at 276-77.   Thus, our statement regarding the availability of
collateral review to correct Guidelines errors was pure dicta.
(Continued)

Three courts of appeals have, however, confronted this precise question, albeit with differing results. In <u>Sun Bear v. United States</u>, 644 F.3d 700 (8th Cir. 2011) (en banc), the Eighth Circuit considered the question following the Supreme Court's decision in <u>Begay</u>, which limited the category of defendants eligible for career offender status by narrowing the definition of a crime of violence. <u>See</u> 553 U.S. at 148.[8] <u>Sun Bear</u> held that career offender status is an "ordinary question[] of [G]uideline interpretation," and that misapplication of this status is not an error that results "in a complete miscarriage of justice." 644 F.3d at 704 (citation omitted).[9]

The Seventh Circuit initially reached a different conclusion. In <u>Narvaez</u>, the court held that because of changes

---

Likewise, as explained above, in <u>Present</u> we assumed that the petitioner had stated a cognizable claim before dismissing his petition as untimely. 190 F.3d at 284. Moreover, the petitioner in <u>Present</u> was arguing for the termination of the supervised release portion of his sentence, a far cry from the situation confronting Whiteside. <u>Id.</u> at 283.

[8] The court first acknowledged that <u>Begay</u> set forth a substantive rule that could be applied retroactively on collateral appeal. We need not consider this preliminary issue with respect to <u>Simmons</u>, since we have previously determined that <u>Simmons</u> announced a substantive rule that may be raised in a habeas proceeding. <u>See</u> <u>Miller v. United States</u>, 735 F.3d 141, 147 (4th Cir. 2013).

[9] It is worth noting that the sentence imposed in <u>Sun Bear</u> was within the Guidelines range applicable even in the absence of the career offender enhancement. <u>Id.</u> at 705.

17

to the law under Begay and Chambers v. United States, 555 U.S. 122 (2009), the defendant "never should have been classified as a career offender and never should have been subjected to the enhanced punishment reserved for such repetitive and violent offenders." Narvaez, 674 F.3d at 627 (emphasis omitted). The court deemed the resulting career offender sentence a miscarriage of justice even though it fell beneath the applicable statutory maximum. Id. at 629. The court explained:

> The imposition of the career offender status branded Mr. Narvaez as a malefactor deserving of far greater punishment than that usually meted out for an otherwise similarly situated individual who had committed the same offense. It created a legal presumption that he was to be treated differently from other offenders because he belonged in a special category reserved for the violent and incorrigible. No amount of evidence in mitigation or extenuation could erase that branding or its effect on his sentence. His designation as a career offender simply took as unchallenged a premise that was not true and gave him no way of avoiding the consequences of that designation.

Id.

Narvaez, however, dealt with a sentence issued prior to United States v. Booker, 543 U.S. 220 (2005), when the Guidelines remained mandatory. Shortly after the Narvaez decision, the Seventh Circuit limited its holding to sentences issued under the mandatory Guidelines. See Hawkins v. United States, 706 F.3d 820, 824 (7th Cir. 2013) supplemented on denial of reh'g, 724 F.3d 915 (7th Cir. 2013), cert. denied, 134 S. Ct.

1280 (Feb. 24, 2014).  In Hawkins, the court held that post-Booker, Guidelines errors were "less serious," and that as long as the sentence imposed was beneath the statutory maximum it was not subject to correction on collateral review.

The Eleventh Circuit then reached the opposite conclusion of both the Eighth and Seventh Circuits.  In a case that was recently vacated pending rehearing en banc, Spencer v. United States, 727 F.3d 1076, 1087 (11th Cir. 2013), vacated pending reh'g en banc, (11th Cir. Mar. 7, 2014), the court stated that an erroneous career offender enhancement amounts to a fundamental miscarriage of justice because "categorization as a career offender is not merely a formal requirement of a criminal procedural rule."  This was true because, even post-Booker, "the Guidelines are the heart of the substantive law of federal sentencing."  Id. at 1087.  Central to the panel's reasoning was the Supreme Court's recent decision in Peugh v. United States, ___ U.S. ___, 133 S. Ct. 2072 (2013).

In Peugh, the Court held that retroactive application of a Guideline that increases a defendant's applicable Guidelines range violates the Ex Post Facto Clause of the Constitution. Id. at 2084.  In the process, the Court reaffirmed the important role that the Guidelines play in sentences issued post-Booker. The Court stated that the Guidelines remain "the lodestone of sentencing," id., and that "[t]he post-Booker federal sentencing

scheme aims to achieve uniformity by ensuring that sentencing decisions are <u>anchored</u> by the Guidelines . . . ." <u>Id.</u> at 2083 (emphasis added). The Court also noted the requirement that "'district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.'" <u>Id.</u> (quoting <u>Gall v. United States</u>, 552 U.S. 38, 50 n.6 (2007)). The Court explained that this and other hurdles "make the imposition of a non-Guidelines sentence less likely," <u>id.</u> at 2083-84, and that an increase in the Guidelines range still creates a "significant risk of a higher sentence." <u>Id.</u> at 2088. In support, the Court cited Sentencing Commission data showing that, absent a government motion for a variance, roughly eighty percent of defendants since 2007 have received within-Guidelines sentences. <u>Id.</u> at 2084.

Relying on the Supreme Court's recent pronouncements and citing additional statistical data concerning the career offender enhancement, the <u>Spencer</u> panel held, "[w]e cannot pretend that, because of <u>Booker</u>, career offender status no longer matters to sentence length." 727 F.3d at 1088. Instead, "an erroneous career offender Guideline calculation, even though

advisory, . . . can amount to a fundamental defect in the sentencing analysis." Id. at 1088-89.[10]

We agree with the Spencer panel's reasoning and hold that an erroneous application of the career offender enhancement amounts to a fundamental miscarriage of justice that is cognizable on collateral review. By no rubric can the impact of the career offender enhancement be considered "ordinary." The Supreme Court has recognized that career offender status creates "a category of offender subject to particularly severe punishment." Buford v. United States, 532 U.S. 59, 60 (2001). And as cited in Spencer, Sentencing Commission data show the continued impact of the enhancement on sentences administered post-Booker. For example, in 2012, the mean sentence for criminal history category VI non-career offenders was 84 months and the median was 60 months. For career offenders, those figures increased to a mean of 163 months and a median of 151 months. For drug trafficking offenses, criminal history category VI non-career offenders received a mean sentence of 115

---

[10] After Peugh, the panel in Hawkins released supplemental opinions discussing Peugh's impact on its case. See 724 F.3d 915 (7th Cir. 2013). Disagreeing with the Eleventh Circuit, the court upheld its earlier decision that the advisory nature of the Guidelines prevented the petitioner from obtaining relief. Id. at 916-17.

months and a median of 96 months; those figures jumped to 154 months and 144 months respectively for career offenders.

Whiteside's case is representative of the enhancement's dramatic impact. Absent the enhancement, he would have faced a Guidelines range of 140 to 175 months; after it was applied, his range skyrocketed to 262 to 327 months.[11] The district court eventually departed downward from this range to a period of 210 months; but that is exactly the point: the court departed downward from what was believed to be the applicable Guidelines range in fashioning the ultimate sentence. The Guidelines range, although advisory, retained its anchoring effect throughout Whiteside's sentencing. It is just that the anchor was dropped in the wrong place. The Supreme Court has recognized this effect, stating that "[e]ven if the sentencing judge sees a reason to vary from the Guidelines, 'if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense the basis for the sentence.'" Peugh, 133 S. Ct. at 2083 (quoting Freeman v. United States, 564 U.S. ___, ___, 131 S. Ct. 2685, 2692 (2011) (plurality opinion)) (emphasis in original).

---

[11] These figures put aside consideration of the statutory minimum penalty, which, of course, we also know was improperly applied in light of Simmons.

In Whiteside's case, had the district court begun with the correct range, it almost certainly would have imposed a different sentence. Consider that if the court had employed the same twenty percent downward departure based on substantial assistance, Whiteside would have received a sentence of 112 months as compared to 210 months. And in the abstract, it is highly unlikely that any defendant with a Guidelines range of 140 to 175 months who has been granted a § 5K1.1 motion for a downward departure would receive a sentence 35 months <u>in excess</u> of the high-end of that range. At the very least, the § 3553 factors supporting such an increase would be subject to rigorous review under <u>Gall</u> on direct appeal.

It is not by accident that the career offender enhancement so significantly impacts defendants' sentences. Unlike most of the Guidelines, which are based on the policy calculations of the Sentencing Commission, the career offender enhancement derives from a congressional requirement. A statute provides that "[t]he Commission shall assure that the [G]uidelines specify a sentence to a term of imprisonment at or near the maximum term authorized" for those who qualify for the enhancement. 28 U.S.C. § 994(h). Heeding this charge, the Commission fashioned strict penalties for career offenders: their criminal history categories are automatically boosted to VI, the highest possible rung, and their offense levels become

23

tied to the statutory maximum penalty as opposed to the actual conduct of conviction.  <u>See</u> U.S.S.G. § 4B1.1(b).  Both factors contributed to the significant increase in Whiteside's Guidelines range.

Clearly then, the impact of the career offender enhancement is far from ordinary.  It is certainly nothing like the two-level enhancement for restraint of the victim which we rejected as a source of habeas relief in <u>Mikalajunas</u>.  That case presents a far better example of a garden variety Guidelines adjustment that, while possibly having an impact on the defendant's sentence, cannot be said to constitute a fundamental miscarriage of justice.  In contrast, an enhancement that casts the defendant as a hopeless recidivist worthy of the strictest possible punishment, and that has the effect of robbing a defendant of his freedom for some eight years, is fundamentally different.[12]

The government is certainly correct in remarking that this case does not present exactly the kind of error recognized by

---

[12] The dissent faults us for failing to provide a "non-arbitrary" line delimiting the types of sentencing errors that constitute "extraordinary circumstances."  <u>Post</u> at 47.  Given the inherent folly of attempting to forecast the contours of "extraordinary" events, our review is quite properly limited to the case before us, and we decide only that when subsequent case law makes manifestly clear that a petitioner was wrongly designated a career offender he may challenge his sentence through a § 2255 motion.

the Supreme Court in <u>Davis</u>.  The petitioner in <u>Davis</u> was convicted for actions later deemed not criminal.  417 U.S. at 346.  The Court remarked that "[t]here can be no room for doubt that such a circumstance inherently results in a complete miscarriage of justice . . . ."  <u>Id.</u> (internal quotation marks and citation omitted).  We reached a similar result in applying <u>Simmons</u> to vacate a felon-in-possession conviction in <u>Miller</u>.  Here, the instant conviction for which Whiteside was sentenced remains valid.  Regardless, though, Whiteside is almost certainly serving time he would not be absent the enhancement.  The mere fact that he was properly convicted does not somehow excuse an obviously legally erroneous sentence.[13]

---

[13] The dissent refuses to acknowledge the basic truth underlying our decision: that Whiteside is not, and <u>was</u> not, properly designated a career offender.  Our sentencing regime prior to <u>Simmons</u> was overinclusive; it swept up defendants whose criminal histories, when viewed individually – a general bugaboo of the dissent – did not expose them to the enhancement. <u>Simmons</u> corrected this mistake by directing district courts to examine the specifics of the defendant's predicate convictions. Under this approach, there is no question Whiteside should not have received the enhancement.  Simply because a criminal defendant was at one point classified a career offender does not mean that classification was ever correct.  Neither the Eighth nor Seventh circuits had any trouble recognizing that by narrowing the definition of the terms "crime of violence" and "violent felony," <u>Begay</u> and <u>Chambers</u> exposed "errors" in how the Guidelines had been applied.  <u>See</u> <u>Sun Bear</u>, 644 F.3d at 704; <u>Hawkins</u>, 706 F.3d at 823.  The effect of <u>Simmons</u> on Whiteside's case is no different.  This point is underscored by our decision in <u>Miller</u> finding <u>Simmons</u> to have announced a new substantive rule retroactive on collateral review.  735 F.3d at 147.  In <u>Miller</u>, we recognized that by "alter[ing] 'the class of persons (Continued)

Nor does the fact that Whiteside was sentenced beneath the applicable statutory maximum mitigate the mistake. Contrary to the government's contention, this fact alone does not make a sentence "lawful," for several reasons. First, such a conclusion is contrary to our well-established principles of appellate review. While sentencing review is highly deferential, that "does not mean there is no review at all." United States v. Abu Ali, 528 F.3d 210, 268-69 (4th Cir. 2008). "If Gall had intended to dispense with any semblance of meaningful review, there would have been no need for the decision . . . to direct district courts to 'correctly calculat[e] the applicable Guidelines range.'" Id. at 265-66 (quoting Gall, 552 U.S. at 49). And when sentencing courts vary from the Guidelines, they must "consider the extent of the deviation and ensure that the justification is sufficiently

---

that the law punishes,'" Simmons had a dramatic impact on the substantive rights of criminal defendants. Id. at 146 (quoting Schriro v. Summerlin, 542 U.S. 348, 353 (2004)). The Miller court had no hesitation in overturning the petitioner's conviction – and his accompanying sentence of 72 months, potentially less time than Whiteside is wrongly serving - even though the conviction was originally consistent with controlling precedent. Id. at 143, 147. Given the continued importance of the Guidelines generally post-Booker, and the impact of the career offender enhancement in particular, there is no reason, in theory or in practice, to reach a different result here. At the very least, there can be no honest question that Whiteside's designation as a career offender was in fact "erroneous."

26

compelling to support the degree of the variance." <u>Gall</u>, 552 U.S. at 50. We have demonstrated our willingness to vacate non-Guidelines sentences that are unreasonable in light of the district court's explanations. <u>See, e.g.</u>, <u>United States v. Engle</u>, 592 F.3d 495, 505 (4th Cir. 2010); <u>Abu Ali</u>, 528 F.3d at 268-69.

Of course, these standards are utilized only on direct appeal. But they highlight the rigor with which we view our role in ensuring that each and every defendant sentenced in federal court receives a fair and reasonable sentence, to say nothing of a lawful one.

The animating principles of fundamental justice are no different here. First, through no fault of his own, Whiteside's opportunity for such review did not arise until after the period in which to file a direct appeal had lapsed. Had Whiteside challenged his career offender status on direct appeal, his argument would have been rejected by our pre-<u>Simmons</u> line of cases. <u>See</u> <u>United States v. Harp</u>, 406 F.3d 242 (4th Cir. 2005); <u>United States v. Jones</u>, 195 F.3d 205 (4th Cir. 1999). He should not be punished – and we mean literally punished, as in additional time spent in federal prison, time which the law does not countenance – for this fact. Acknowledging that a defendant would likely be entitled to a vacated sentence on direct appeal but not on a timely filed habeas motion simply due to the timing

27

of one of our decisions contributes to the conclusion that denial of review operates a complete miscarriage of justice.

Second, the Supreme Court just last year told us that the advisory nature of the Guidelines does not cure the harm that results from utilizing an incorrect Guidelines range as a starting point. See Peugh, 133 S. Ct. at 2086; see also Spencer, 727 F.3d at 1087 ("The Seventh Circuit [in Hawkins] may think that mistakenly categorizing a defendant as a career offender became not very serious once Booker made the Guidelines advisory, but the Supreme Court told us in June . . . that the Guidelines are still 'the lodestone of sentencing.'" (quoting Peugh, 133 S. Ct. 2084)) (citation omitted). In Peugh, the Court ruled that retroactive application of a Guideline violates the Constitution even when the vacated sentence is beneath the statutory maximum. The Court stated, "that a district court may ultimately sentence a given defendant outside the Guidelines range does not deprive the Guidelines of force as the framework for sentencing." Peugh, 133 S. Ct. 2076. And though Peugh concerned a direct appeal, it found error of constitutional magnitude, indicating that the mistake also would have been correctable on collateral review.

In addition to the continued vitality of the Guidelines in an advisory system, Peugh also drew on the principles of fairness and justice that animate the Ex Post Facto Clause. Id.

28

at 2085 ("[T]he Clause also safeguards a fundamental fairness interest . . . in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life." (internal quotation marks and citation omitted) (ellipsis in original)); id. ("[The Clause] does not merely protect reliance interests. It also reflects principles of fundamental justice."). We find that these principles map easily onto our analysis of whether Whiteside was subject to a fundamental miscarriage of justice. Because of the career offender enhancement, Whiteside's sentence is plainly at odds with what he would receive were he sentenced today. He is not a career offender, and he should not serve a sentence that was based on his classification as one. The mere fact that his sentence was beneath the statutory maximum does not somehow assuage this fundamental unfairness.

In the face of this clear injustice, the government pleads that we respect – with something approaching sanctity – the finality of sentencing decisions. We agree that finality is an important consideration. It encourages defendants to accept their punishments and move forward with their lives; as well, it minimizes the misuse of judicial resources. Perhaps most importantly, in cases involving victims, finality offers these individuals some degree of peace of mind and a sense that their suffering has not been forgotten. But we do not agree that

these considerations, to the extent that they apply here, can or should outweigh the plain injustice that would result from denying the petitioner what he seeks, which is only a chance to be sentenced according to the factors that everyone agrees should apply. Were we to conclude otherwise, we would be putting "bureaucratic achievement" ahead of our task of ensuring that all those who come before us receive meaningful review of their claims. Gilbert v. United States, 641 F.3d 1293, 1337 (11th Cir. 2011) (Hill, J., dissenting). We are more than mere gatekeepers. Congress has given us the authority on collateral review to relieve errors that amount to fundamental defects in process or justice. Erroneous application of the career offender enhancement works such an injustice, and we will not turn a blind eye to so obvious an error simply for the sake of finality.[14]

---

[14] Unfortunately, our dissenting colleague sounds the alarm that after today's decision no criminal sentence is safe from collateral attack. The dissent's attempts to expand our holding on our behalf could only result from its larger, misguided goal of convincing the reader that habeas relief is somehow harmed by its utilization. Somewhat amazingly, the dissent is explicit on this point. Post at 68. With due respect to our colleague's views, habeas review is not merely a deterrent that fulfills its purpose by its threatened use; criminal defendants are aided only when it is employed. The dissent would have its own exaltation of the history of the Great Writ and § 2255 relief contribute to the mechanism's futility. Accusing us of Whig history, the dissent's approach is rank with the fearful mistrust of individualized decision-making inherent to traditional conservatism. The suggestion that district courts (Continued)

Because we find that Whiteside suffered a fundamental miscarriage of justice, we need not address his additional claim that the error violated his constitutional rights to due process. We have, however, considered the constitutional question to the extent necessary to grant a certificate of appealability, which has yet to issue in this case. See 28 U.S.C. § 2255(c) (permitting issuance of a certificate of appealability only where petitioner "has made a substantial showing of the denial of a constitutional right") (emphasis added). A certificate of appealability may issue on a constitutional question that is "debatable." Miller-El v. Cockrell, 537 U.S. 322, 337, 338 (2003). We are satisfied that, for the same reasons discussed above with regard to the fundamental defect/miscarriage of justice claim, it is at least debatable that erroneous application of the career offender enhancement deprived Whiteside of his liberty in violation of

---

and future panels of this court cannot discern actual injustices from less serious errors casts too critical an eye on the judges throughout our circuit. In short, we simply do not share the view that the criminal justice system is somehow harmed when defendants are sentenced according to a proper understanding and application of the law.

his due process rights.   We therefore grant a certificate of appealability.[15]

IV.

For the reasons stated above, we hold that equitable tolling applies to Whiteside's claim.   We also hold that erroneous application of the career offender enhancement amounts to a fundamental miscarriage of justice that can be corrected on collateral review.   We grant a certificate of appealability, vacate Whiteside's sentence, and remand the case for resentencing.

VACATED AND REMANDED FOR RESENTENCING

---

[15] Although Whiteside fashioned his due process claim on the Supreme Court's decision in <u>Hicks v. Oklahoma</u>, 447 U.S. 343 (1980), we think any such claim more aptly derives from <u>Simmons</u> itself.   For this reason, we need not address the government's position that the claim is barred by the non-retroactivity doctrine of <u>Teague v. Lane</u>, 489 U.S. 288 (1989) (holding that new rules of criminal procedure may not be raised in post-conviction proceedings), since we have already held that <u>Simmons</u> announced a substantive rule that is applicable on collateral review.   <u>See</u> <u>Miller</u>, 735 F.3d at 147.

DAVIS, Senior Circuit Judge, concurring:

I am pleased to join Judge Gregory's extraordinarily compelling opinion, which fully responds to the dissent's overwrought and formalistic protestations that our judgment here presages an end to law as we know it. (Evidently, it is not enough simply for the dissent to say that there is no miscarriage of justice shown on this record.)

The dissenting opinion is hopelessly pleased with itself. This is not surprising, as it prostrates itself at the altar of finality, draped in the sacred shroud of judicial restraint. There is much that could be said about the dissenting opinion's paean to finality, but one can hardly say it more poignantly or more persuasively than has Judge Rovner. See Hawkins v. United States, 724 F.3d 915, 919-25 (7th Cir. 2013) (Rovner, J., dissenting from the denial of rehearing), en banc reh'g denied, 725 F.3d 680 (7th Cir. 2013) (Rovner, J., joined by Wood, Williams, and Hamilton, JJ., dissenting from denial of rehearing en banc).

In any event, what's remarkable is that, as viewed through the lens of our good friend's dissenting opinion, it is perfectly fine for the United States Department of Justice, which is to say the Executive Branch, to bypass supposed reverence for finality on a case-by-case basis, through waivers of limitations and other devices, see ante, Maj. op., n.6, but

33

the Third Branch is duty-bound never to acknowledge instances in which law's interest in finality must give way to competing values rooted in our shared abhorrence of manifest injustice. To devolve to the Executive Branch <u>sole</u> <u>authority</u> to identify a cognizable miscarriage of justice amounts to judicial abdication, not judicial restraint. Such an approach enjoys no legitimate place in our scheme of institutional checks and balances. The Third Branch's transcendent role, in our enviable but imperfect system of criminal justice, is to afford protection from the loss of individual liberty resulting from profoundly erroneous decision-making, and not least of all, erroneous decision-making by the Third Branch itself, as in this very case.

The dissenting opinion favors what's "finished" over what's "right" and thereby blinks at a profound miscarriage of justice. It is wrong to do so.

WILKINSON, Circuit Judge, dissenting:

Deangelo Whiteside was properly designated a career offender in the course of his federal sentencing proceedings. Now, years later, the majority vacates that sentence. In invalidating Whiteside's sentence, the majority creates a circuit split over whether career-offender designations are cognizable on collateral review, and ignores settled law as to whether changes in circuit precedent can reset the statute of limitations for post-conviction review of federal criminal proceedings.

The majority opinion represents a dramatic expansion of federal collateral review that is unsupported by law or precedent. It makes a shambles of the retroactivity doctrines that have long safeguarded the basic finality of criminal convictions. It disrupts the orderly administration of our criminal-justice system.

If it were purely a matter of orderly administration, that might be an arid basis on which to deny relief. But there was no injustice done here. Whiteside pled guilty to possession with intent to distribute at least 50 grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1), and his two predicate felony drug offenses plainly qualified him for career-offender status under U.S.S.G. § 4B1.1, a status to which Whiteside did not object.

35

None of these convictions has ever been invalidated. No procedural or substantive irregularity ever marked the plea or sentencing proceedings. In short, Whiteside was sentenced according to the law as it existed at that time. Absent a constitutional violation or miscarriage of justice, neither of which is remotely present here, that is all a criminal defendant can ask or expect. Moreover, the defendant must raise the petition in a timely manner, which Whiteside has failed to do.

My colleagues attempt a basic restructuring of the purposes of collateral review in not one, but two, respects. It is bad enough that the majority envisions collateral proceedings as a form of error correction intended, not so subtly, to supplant direct review. The comparative question the majority poses is even worse. It inquires whether yesterday's result was the same that would or should obtain today. To the contrary, collateral review is what its name implies: whether the proceedings under review conformed to law as it instructed at the time. If they did, the rule of law was honored and upheld, and further inquiry is impermissible.

Because any other disposition of this case would open concededly lawful proceedings to endless and untimely collateral attack, I would affirm the district court's dismissal of the petition. For the reasons set forth below, I respectfully dissent.

36

I.

The majority opinion creates a square circuit conflict over whether allegedly erroneous career-offender designations in particular, and what Sentencing Guidelines errors in general, are cognizable on a 28 U.S.C. § 2255 petition for collateral review.  On one side are the opinions of the Seventh and Eighth Circuits holding challenges to career-offender designations not cognizable.  <u>See Hawkins v. United States</u>, 706 F.3d 820, 823 (7th Cir. 2013), <u>supplemented on denial of reh'g</u>, 724 F.3d 915 (7th Cir. 2013), <u>cert. denied</u>, 82 U.S.L.W. 3308 (U.S. Feb. 24, 2014) (No. 13-538); <u>Sun Bear v. United States</u>, 644 F.3d 700, 705-06 (8th Cir. 2011) (en banc).  On the other side are my colleagues in the majority and, until recently, an opinion in the Eleventh Circuit, <u>see Spencer v. United States</u>, 727 F.3d 1076, 1088-89 (11th Cir. 2013), <u>vacated pending reh'g en banc</u>, (11th Cir. Mar. 7, 2014) (No. 10-10676).  As I see this dispute as both a primary and threshold issue, I shall address it first.

Like traditional habeas corpus, § 2255 "does not encompass all claimed errors in conviction and sentencing." <u>United States v. Addonizio</u>, 442 U.S. 178, 185 (1979).  A trial error that is neither constitutional nor jurisdictional is cognizable under § 2255 only if it constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair

37

procedure." Hill v. United States, 368 U.S. 424, 428 (1962).
Courts have consistently reaffirmed this principle since Hill.
See, e.g., Brecht v. Abrahamson, 507 U.S. 619, 634 n.8 (1993);
United States v. Timmreck, 441 U.S. 780, 783-84 (1979); United
States v. Mikalajunas, 186 F.3d 490, 495-96 (4th Cir. 1999).

As neither Whiteside nor the majority claims that the
district court lacked jurisdiction when it sentenced him as a
career offender, Whiteside's claim is only cognizable if it
alleges a constitutional error or a fundamental defect resulting
in a miscarriage of justice. Whiteside can satisfy neither of
these requirements.

### A.

The heart of collateral review is the correction of
constitutional error. In fact, a certificate of appealability,
which is necessary to appeal from a district court's final order
in a § 2255 proceeding, requires the petitioner to make "a
substantial showing of the denial of a constitutional right."
28 U.S.C. § 2253(c)(2). Whiteside has made no "substantial
showing" of the denial of a "constitutional right." And even if
he had made such a showing, he could not possibly prevail on the
merits of his claim.

The only colorable constitutional claim even plausibly
available to Whiteside is that he was denied due process in
violation of the Fifth Amendment. But there was no denial of

38

due process here.  There is no claim of procedural irregularity occurring at any point in these proceedings.  While the sentencing regime in force at the time of Whiteside's sentencing was later overturned in United States v. Simmons, 649 F.3d 237, 241 (4th Cir. 2011) (en banc), nothing in that case suggests that Whiteside's sentence failed to comply with the law in force at the time the sentence was imposed.  The method for analyzing predicate state-court convictions applied in Whitside's case had been affirmed by numerous panels of this court.  See, e.g., United States v. Harp, 406 F.3d 242, 246 (4th Cir. 2005); United States v. Jones, 195 F.3d 205, 207 (4th Cir. 1999).  Indeed, the case that overturned the rule in force at the time of Whiteside's sentencing did not occur until August 2011, well after Whiteside's own case was finalized in August 2010.

I thus cannot embrace the paradox that a manifestly lawful criminal proceeding amounts to an unlawful deprivation of due process.  Lawful one day, unlawful the next -- it makes no sense.  The doctrinal hook for Whiteside's due process challenge, the Supreme Court's decision in Hicks v. Oklahoma, 447 U.S. 343 (1980), provides no support for his claim.  In Hicks, the jury imposed a mandatory-minimum 40-year sentence after being instructed that it was required to do so in light of the petitioner's two prior state convictions.  Later, the Oklahoma Court of Criminal Appeals declared the mandatory-

minimum law unconstitutional but refused to vacate the petitioner's sentence. The Supreme Court reversed, finding that the petitioner's due process rights were violated when the jury's discretion to sentence below the mandatory-minimum 40-year term was improperly limited, even though the sentence imposed was beneath the statutory maximum. See <u>Hicks</u>, 447 U.S. at 344-46.

<u>Hicks</u> differs markedly from this case: the <u>Hicks</u> jury was <u>barred</u> from exercising its full sentencing discretion, whereas the district court here not only recognized that it had discretion to depart from the Guidelines range, but in fact did so when it sentenced Whiteside to a below-Guidelines sentence. This distinction makes all the difference. Whiteside was entitled to a sentence somewhere between the statutory minimum and maximum, imposed after the Guidelines range was properly calculated in accordance with the law that existed at the time. This he received, and thus there is no violation of any sort anywhere to be found.

But even if <u>Hicks</u> could be bent and stretched to support Whiteside's due process claim, it would still be procedurally unavailable to him. Under <u>Teague v. Lane</u>, 489 U.S. 288 (1989), a court may not apply a new rule of constitutional criminal procedure on habeas except in two narrow and infrequent instances: where the rule places conduct outside the scope of

criminal sanction, see Saffle v. Parks, 494 U.S. 484, 494 (1990), or constitutes a "'watershed rule[] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding," id. at 495 (quoting Teague, 489 U.S. at 311 (plurality opinion)); see also United States v. Martinez, 139 F.3d 412, 416 (4th Cir. 1998) (holding that Teague applies to § 2255 petitions).

Teague insisted, then, that retroactivity doctrine not succumb to a severe case of presentism, where a decision later in time not only becomes the law, but seeks to discredit all that went before. Thus, a rule is new for Teague purposes if it was not "dictated by precedent existing at the time the defendant's conviction became final." Graham v. Collins, 506 U.S. 461, 467 (1993) (quoting Teague, 489 U.S. at 301) (emphasis and internal quotation marks omitted). A novel "application of an old rule in a manner that was not dictated by precedent" counts as a new rule for Teague purposes. Stringer v. Black, 503 U.S. 222, 228 (1992).

Because Hicks does not apply at all to Whiteside's situation, let alone squarely address it, Whiteside's attempt to extend Hicks would require us to announce and retroactively apply a new rule of constitutional criminal procedure on collateral review: namely that a criminal defendant has a constitutional right to an amended sentence based on later

41

decisional law that calls into question an advisory Guidelines calculation manifestly correct at the time it was imposed. This case is thus very different from Miller v. United States, in which we held that, under the retroactivity principles announced in Schriro v. Summerlin, 542 U.S. 348 (2004), Simmons was a substantive rule and thus applied retroactively where the petitioner's § 2255 petition alleged actual innocence of a conviction for firearm possession by a felon. 735 F.3d 141, 145-47 (4th Cir. 2013). Here, by contrast, Whiteside asks us to announce a novel due process rule that is completely distinct from Simmons itself.

Furthermore, Whiteside's proposed new rule would not fit in either of the Teague exceptions. It does not place any conduct outside the reach of the criminal law. Nor does it present the exceedingly rare case of a "watershed rule of criminal procedure," since the procedural rule that Whiteside wants us to announce is not "implicit in the concept of ordered liberty." Teague, 489 U.S. at 311 (quoting Mackey v. United States, 401 U.S. 667, 693 (1971) (Harlan, J., concurring in the judgments in part and dissenting in part)) (internal quotation marks omitted). Thus, Teague forbids the constitutional relief that Whiteside seeks.

Seeking to avoid Teague's restrictions, the majority tries to hang its constitutional case on Simmons itself and issue the

42

certificate of appealability on that basis. See Maj. Op. at 31 & n.15. But Simmons, even if declared retroactive by Miller, is a case about statutory interpretation -- namely the interpretation of federal sentencing law -- not the Constitution. Given that Hicks is far afield and that any rule derived obliquely from it cannot possibly be made retroactive under Teague, Whiteside has no constitutional claim and no entitlement to a certificate of appealability.

B.

Given that Whiteside has no available constitutional claim, the majority must show that, in light of Simmons, his sentence is marred by a fundamental defect that resulted in a miscarriage of justice. This it cannot do. Although some questions of federal law are cognizable on § 2255, advisory Guidelines determinations are not except in the most extraordinary of circumstances. This is not such a case, and underlying the majority's attempt to find Whiteside's claim cognizable are three serious and pervasive errors.

First, the majority refuses to recognize that, after United States v. Booker, 543 U.S. 220 (2005), errors in calculating Guidelines ranges are "less serious" than they were previously because the ranges are no longer binding on sentencing judges. Hawkins, 706 F.3d at 824. The situation might be different if the Guidelines were still mandatory. But those who fought for

43

so long to escape the binding strictures of Guidelines sentences cannot now complain that just because they influence sentencing behavior they must be treated as binding law.  Far from binding, they may not even be presumed reasonable.  See Gall v. United States, 552 U.S. 38, 50 (2007).  The majority today refuses to respect the major tradeoff of the post-Booker regime: now that the Guidelines are merely advisory, they lack the force of binding law at the sentencing phase and thus the ability to activate collateral review.  As Justice Sutherland observed, if laws are not "upheld when they pinch as well as when they comfort, they may as well be abandoned."  Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 483 (1934) (Sutherland, J., dissenting).  The majority disregards this honored maxim and seeks to have it both ways.

That the Guidelines are advisory is no mere theoretical point; on remand, the district court will be perfectly free to impose the exact same sentence on Whiteside.  It is notable that the district court granted Whiteside only a limited downward departure for substantial assistance, a departure that was itself broadly discretionary.  See United States v. Pearce, 191 F.3d 488, 492 (4th Cir. 1999).  From a recommended Guidelines range of 262 to 327 months, the district court departed by less than 20 percent from the bottom of the Guidelines range.  The district court could have departed downward significantly more

44

but did not, strongly suggesting that it viewed Whiteside's criminal record as serious and the Guidelines range as generally appropriate.

The scenarios spun by the majority on what might or might not happen on resentencing are nothing more than rank speculation. The majority suggests that the district court would likely be unable to satisfy 18 U.S.C. § 3553's sentencing factors and "rigorous review under Gall on direct appeal" if it departed by 20 percent above the top of the newly calculated Guidelines range of 140 to 175 months and imposed an identical sentence of 210 months. Maj. Op. at 23. Quite apart from this bald attempt to put the hammer to the district court, such speculation ignores the "broad sentencing discretion" afforded trial judges, Alleyne v. United States, 133 S. Ct. 2151, 2163 (2013), and the lengthy criminal record described in Whiteside's presentencing report that will be available for consideration on resentencing. Whiteside's record includes, but is not limited to, 10 controlled-substances offenses, 7 counts of assault with a deadly weapon on a government officer, and additional counts of assault, hit and run, and resisting a public officer -- convictions that Simmons does nothing to undermine. This lengthy record is impossible to minimize, since, quite independently of the career-offender designation, Whiteside's extensive criminal history caused the presentencing report to

45

recommend a criminal-history category of V. Thus, the assumption underlying the majority's ruling -- that but for the career-offender enhancement Whiteside could have shaved years and years off his sentence -- is highly questionable.

Second, the majority argues that, because the Guidelines still exert a substantial influence on sentencing, career-offender designations are serious enough to be cognizable on collateral review. No one could deny that the Guidelines are still influential even after <u>Booker</u>. Mere influence on the ultimate sentence, however, is insufficient to warrant correction under § 2255. <u>See, e.g.</u>, <u>Daniels v. United States</u>, 532 U.S. 374, 376 (2001) (holding that § 2255 cannot generally be used to challenge predicate convictions under the Armed Career Criminal Act of 1984); <u>Addonizio</u>, 442 U.S. at 190 (holding that § 2255 is unavailable to prisoner seeking resentencing when post-sentencing changes in parole release-date calculations allegedly increased effective sentence beyond that which original sentencing judge intended); <u>Mikalajunas</u>, 186 F.3d at 496 (holding that erroneous sentencing enhancement for restraint of victim was "ordinary misapplication of the [Guidelines] that does not amount to a miscarriage of justice").

The majority never explains how the reality of error correction customarily reserved for direct appeal is to be reconciled with the broad scope it now proposes for § 2255

46

review.    Nor  can  it,  since  there  is  no  clear  line  to
differentiate  why  this  Guidelines  calculation  is  open  to
collateral  attack  and  others  are  not.    The  majority  apparently
believes  that  career-offender  designations  are  "far  from
ordinary"  and  should  be  subject  to  challenge,  Maj.  Op.  at  24,
but  why  stop  there?    I  cannot  fathom.    The  majority  offers  no
basis  in  law  for  its  ruling,  and  the  main  reason  given  is  that  a
career-offender  designation  results  in  a  substantially  larger
prison  term  and  "casts  the  defendant  as  a  hopeless  recidivist
worthy  of  the  strictest  possible  punishment."    Id.    It  is  left
to  the  reader  to  divine  why  the  application  of  such  a  penalty
constitutes  "extraordinary  circumstances"  justifying  collateral
review.    United States v. Pregent, 190 F.3d 279, 283 (4th Cir.
1999).    Every  Guidelines  calculation  may  affect  the  sentencing
range  to  a  greater  or  lesser  degree,  and  the  majority  does  not
even  hint  at  a  non-arbitrary  dividing  line.    Instead  of  a  legal
principle,  all  we  get  is  the  majority's  pronunciamento  along
with  the  irrelevant  observation  that  Congress,  as  it  had  every
right  to  do,  outlined  the  contours  of  the  career-offender
enhancement  for  those  whose  extensive  history  of  law-breaking
posed  a  continuing  social  threat.    See  Maj.  Op.  at  23.

Finally,  the  majority  confuses  a  change  in  law  favorable  to
a  defendant  with  a  fundamental  breakdown  in  procedure  or
justice.    As  explained  above,  Whiteside's  sentence  was  imposed

47

properly, with no procedural irregularities or substantive errors. Thus, to hold that Whiteside's situation warrants § 2255 relief implies that every change in law creates a manifest injustice no matter how lawful the prior proceeding. But "[p]recedential decisions come pouring out of the federal courts of appeals and the Supreme Court." Hawkins, 706 F.3d at 824. This ebb and flow of decisional law seldom implicates the fundamental canons of justice. See Teague, 489 U.S. at 313 (noting that, because procedures falling under Teague's second exception are "so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge").

Rather than fundamental recastings of the foundations of justice, most changes in law represent close and contestable questions on which capable jurists can reasonably disagree. Simmons is a case in point. The Simmons panel, which incidentally included a former Supreme Court Justice, held that Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010), the basis for the en banc majority's decision, did not "compel[] a different result" from the Harp regime for analyzing predicate state-court convictions. United States v. Simmons, 635 F.3d 140, 142 (4th Cir. 2011), rev'd en banc, 649 F.3d 237 (4th Cir. 2011). The en banc decision featured opposing views, ably and earnestly advanced. Compare Simmons, 649 F.3d at 239 (Motz, J.), with id.

48

at 250 (Duncan, J., dissenting), and id. (Agee, J., dissenting).
To say now that those on the losing side of the debate were
party to some "miscarriage of justice" requiring collateral
relief, Hill, 368 U.S. at 428, disserves those whom I know my
friends in the majority hold in the highest esteem.

   To further say that a criminal defendant lawfully sentenced
prior to Simmons was the victim of some manifest injustice is to
adopt a naively Whig history of law as an unbroken march toward
progress and enlightenment, when in truth it is more often a
matter of fits and starts, of limitless gray areas, all bereft
of the guarantee that later attempts to reconcile public safety
with human liberty will necessarily be better than earlier ones.
The majority's approach to retroactivity also ignores the
analogous reality that plea bargains are contracts under which,
in exchange for avoiding the uncertainties of trial, the
defendant "assumes the risk of future changes in circumstances
in light of which [his] bargain may prove to have been a bad
one." United States v. Bownes, 405 F.3d 634, 636 (7th Cir.
2005). This assumed risk includes the forfeiture of later
advantageous legal developments. To say that a later change in
law should automatically make a plea agreement or, as here, a
lawful prior proceeding invalid is to render law provisional and
judgment advisory, good only until the inevitable next round.

Once we recognize that a favorable change in law does not automatically render prior lawfully imposed sentences unjust, it becomes clear why collateral review is a poor forum for correcting sentencing errors. Unlike with ineffective-assistance-of-counsel claims, sentencing issues can usually, even if not always, be effectively fixed on direct appeal. The majority's invocation of the "rigor" with which appellate courts review sentences on direct appeal only supports this point. Maj. Op. at 27; see also id. at 23. It does nothing to undermine a "basic distinction between direct review and collateral review": that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." Addonizio, 442 U.S. at 184.

C.

In addition to being conceptually unsound, the majority's holding that Whiteside's claim is cognizable under § 2255 leads it to misread Supreme Court precedent and run roughshod over our own.

The Supreme Court cases upon which the majority and Whiteside rely are in another room. In Peugh v. United States, the Court held that the Ex Post Facto Clause forbids a district court from using Sentencing Guidelines promulgated after the original offense to sentence a defendant if the later Guidelines increase the recommended sentencing range. 133 S. Ct. 2072,

50

2084 (2013).  But _Peugh_ is readily distinguishable.  First, it deals with _constitutional_ error.  Second, it deals with _direct appeal_.  The standard for ex post facto challenges articulated in a case like _Peugh_ –– that the change in law create merely "a 'significant risk' of a higher sentence," _Peugh_, 133 S. Ct. at 2088 –– is substantially less demanding than the requirement of a fundamental defect leading to a miscarriage of justice for collateral attack on non-constitutional errors.  And third, there is no indication that the Supreme Court intended _Peugh_'s holding to apply retroactively to already-final sentences such as Whiteside's.  _See Hawkins_, 724 F.3d at 916-18.

_Johnson v. United States_, 544 U.S. 295 (2005), similarly fails to support Whiteside's position.  _Johnson_ dealt with § 2255's one-year statute of limitations.  There, the Supreme Court stated that it shared the petitioner's "preliminary assumption that if he filed his § 2255 motion in time, he is entitled to federal resentencing now that the State has vacated one of the judgments supporting his enhanced sentence." _Id._ at 302-03.  This assumption was irrelevant to the disposition of the case, however, since the Court held that the § 2255 petition at issue was time-barred.  _Id._ at 311.  Furthermore, the assumption was made in the context of the vacatur of predicate state convictions; here, there is no question that Whiteside's

51

state convictions are still valid and that the district court could, would, and should consider them on resentencing.

Finally Davis v. United States, 417 U.S. 333 (1974), is inapposite to this case.  In Davis, the Supreme Court held that § 2255 could be used to challenge a conviction when an intervening change in law rendered the act upon which the conviction was based one "that the law does not make criminal." 417 U.S. at 346.  Davis held: "There can be no room for doubt that such a circumstance 'inherently results in a complete miscarriage of justice' and 'present[s] exceptional circumstances' that justify collateral relief under § 2255." Id. at 346-47 (alteration in original).  But nothing in Davis suggests that its holding should extend to cases where, as here, the intervening change in law did not undermine the underlying convictions.  The difference is one of night and day.  To say as the majority does that "this case does not present exactly the kind of error" at issue in Davis is an understatement, to put it mildly.  Maj. Op. at 24.

If the majority opinion distorts Supreme Court precedent, it tramples our own.  Whiteside states that "[d]eciding this case requires the Court to break new ground in this Circuit," a euphemistic way of inviting us to disregard our prior precedent. Appellant's Reply Br. at 27.

52

Sadly, the invitation has been accepted.  We held in <u>United States v. Pregent</u>, "[b]arring extraordinary circumstances . . . , an error in the application of the Sentencing Guidelines cannot be raised in a § 2255 proceeding." 190 F.3d at 283-84; <u>see also</u> <u>United States v. Goines</u>, 357 F.3d 469, 477 (4th Cir. 2004) ("[Guidelines] claims ordinarily are not cognizable in § 2255 proceedings."); <u>Mikalajunas</u>, 186 F.3d at 496 ("[A] misapplication of the [Sentencing Guidelines] typically does not constitute a miscarriage of justice.").  These cases all came from the era in which the Sentencing Guidelines were virtually mandatory.  Their teachings are all the more compelling in the present advisory Guidelines period.  For if Guidelines calculations were not cognizable on collateral review in their all-but-mandatory form prior to <u>Booker</u>, they certainly cannot be cognizable in their new advisory status.

Moreover, the holdings in the above cases stem from the fact that § 2255 is designed for "cases in which 'the sentence was in excess of the maximum authorized by law.'" <u>Pregent</u>, 190 F.3d at 284 (quoting 28 U.S.C. § 2255(a)).  Here, however, Whiteside's career-offender designation did not increase his statutory maximum.  As Judge King recognized in <u>United States v. Powell</u>, because career-offender designations do not lead to "sentences exceeding the applicable statutory maximum," they are thus not challengeable under § 2255.  691 F.3d 554, 563 n.2 (4th

53

Cir. 2012) (King, J., dissenting in part and concurring in the judgment in part).

Similarly, in United States v. Pettiford, 612 F.3d 270 (4th Cir. 2010), we ruled that there was no miscarriage of justice, and thus no remedy available under § 2255, for a prisoner challenging his career-offender sentence when two of the underlying predicate convictions had been vacated but the career-offender designation was still supported by the remaining convictions. In that case, as here, the district court could have imposed an identical sentence following vacatur. Thus, there was "no evidence that [the petitioner's] sentencing was constitutionally defective or flawed in a fundamental way." Pettiford, 612 F.3d at 278.

II.

In addition to being non-cognizable, Whiteside's claim for relief is time-barred. 28 U.S.C. § 2255(f) provides for a one-year statute of limitations that is triggered by one of four conditions, whichever occurs latest:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has

54

been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f)(1)-(4).

### A.

Whiteside contends that his claim fits under (f)(4), and that United States v. Simmons, 649 F.3d 237 (4th Cir. 2011) (en banc), qualified as a new "fact" for purposes of that provision. Whiteside's suit is timely under this theory, since he filed less than a year after Simmons was handed down. Although the majority does not adopt Whiteside's statutory argument, an explanation of the statutory scheme is still necessary to illustrate the many ways in which the majority's equitable holding negates it.

Whiteside grounds his argument on the Supreme Court's decision in Johnson v. United States, 544 U.S. 295 (2005). In Johnson, the defendant's sentence in the original proceeding was enhanced on the basis of a state conviction which was later vacated. Following vacatur, Johnson sought federal post-conviction relief, contending that his enhanced sentence was no longer valid. Johnson's conviction had become final more than a year before his § 2255 petition was filed, but the Court concluded that the vacatur qualified as a new fact for purposes

of (f)(4).   See Johnson, 544 U.S. at 300-02.   As the Court

noted:

> We commonly speak of the "fact of a prior conviction,"
> and an order vacating a predicate conviction is spoken
> of as a fact just as sensibly as the order entering
> it.   In either case, a claim of such a fact is subject
> to proof or disproof like any other factual issue.

Id. at 306-07 (citation omitted).

    Johnson does not govern Whiteside's claim.   Simmons

represented a change of law, not fact.   The circuits to have

considered this type of issue have uniformly reached the same

conclusion.   See, e.g., Phillips v. United States, 734 F.3d 573,

580 (6th Cir. 2013); Sanchez v. United States, 318 F. App'x 801,

804 & n.6 (11th Cir. 2009) (unpublished per curiam); Lo v.

Endicott, 506 F.3d 572, 575 (7th Cir. 2007); E.J.R.E. v. United

States, 453 F.3d 1094, 1098 (8th Cir. 2006); Shannon v. Newland,

410 F.3d 1083, 1088-89 (9th Cir. 2005); see also Minter v. Beck,

230 F.3d 663, 666 (4th Cir. 2000) (rejecting, in a similar

context, defendant's attempt to invoke a change in law outside

(f)(3)).

    Contrary to the vacatur at issue in Johnson, Simmons did

not directly alter Whiteside's legal status as a prior state

offender.   See Lo, 506 F.3d at 575.   A conviction is a fact for

sentencing purposes, but a relevant legal rule is not.   Simmons,

"unlike a predicate conviction, is a ruling exclusively within

the domain of the courts and is incapable of being proved or

56

disproved." E.J.R.E., 453 F.3d at 1098. This point is illustrated by the simple observation that "[w]e would never . . . ask a jury to decide whether a judicial decision had indeed changed [the] law in the relevant way, nor would the parties introduce evidence on the question." Shannon, 410 F.3d at 1089. Indeed, if this change in law is a "fact," then what would not be?

Instead of altering the factual landscape, Simmons merely announced a generally applicable legal rule. But a decision "establishing an abstract proposition of law arguably helpful to the petitioner's claim does not constitute the 'factual predicate' for that claim." Id. Decisions that update the legal significance of certain facts without modifying them do not qualify under (f)(4). Simmons did precisely this: unlike a vacatur decision, it altered the legal significance of Whiteside's prior convictions without amending the convictions themselves. See Owens v. Boyd, 235 F.3d 356, 359 (7th Cir. 2000) ("Time begins when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance."); see also United States v. Pollard, 416 F.3d 48, 55 (D.C. Cir. 2005).

Whiteside's (f)(4) argument fails for the additional reason that it would effectively nullify (f)(3), which provides for tolling in instances where the defendant's claim is founded on a

57

right "newly recognized by the Supreme Court and made
retroactively applicable to cases on collateral review." 28
U.S.C. § 2255(f)(3). As the Eighth Circuit has reasoned:

> [The specific criteria enumerated in (f)(3) for
> tolling the limitations period] impliedly reject[] the
> notion that the creation of a new right by the Supreme
> Court that is not made retroactive to cases on
> collateral review, other rulings of law by the Supreme
> Court, and decisions taken from the courts of appeal
> in all instances, could trigger any of the limitations
> periods enumerated under § 2255.

E.J.R.E., 453 F.3d at 1098.

If changes in law are cognizable under (f)(4), then (f)(3)
becomes superfluous because any claim brought under (f)(3) could
also be brought under (f)(4). See Lo, 506 F.3d at 575. "To
suggest, as [the petitioner] does, that any decision by any
court on any issue could constitute a 'factual predicate' would
swallow up the specifically delineated limitations in" (f)(3).
Id. at 576. These considerations indicate that "subsequent
interpretations of the law can be the basis of delay in filing a
§ 2255 motion only in accordance with" (f)(3) -- not (f)(4).
Sun Bear v. United States, 644 F.3d 700, 702 n.5 (8th Cir. 2011)
(en banc) (internal quotation marks omitted). Notably,
Whiteside does not even attempt to argue that his claim
satisfies the requirements specified in (f)(3).

B.

Recognizing the speciousness of his statutory argument, Whiteside asserts in the alternative -- in an argument embraced by the majority -- that the statute of limitations should be equitably tolled. Equitable tolling of petitions for collateral review is available only when a defendant demonstrates "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010) (internal quotation marks omitted). Under this court's precedent, equitable tolling is appropriate in those "rare instances where -- due to circumstances external to the party's own conduct -- it would be unconscionable to enforce the limitation period against the party and gross injustice would result." Rouse v. Lee, 339 F.3d 238, 246 (4th Cir. 2003) (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000)) (internal quotation marks omitted); see also United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004).

Whiteside claims that he was prevented from timely filing by the unfavorable precedent that would have governed his claim had he sued prior to Simmons. The standard announced in Holland, however, focuses not on whether unfavorable precedent would have rendered a timely claim futile, but on whether a factor beyond the defendant's control prevented him from filing

59

within the limitations period at all.  See Shannon, 410 F.3d at 1090.  Although Simmons plainly made a collateral attack on Whiteside's sentence more plausible, nothing prevented Whiteside from filing his petition within the one-year statute of limitations.  See E.J.R.E., 453 F.3d at 1098.

This court's decision in Minter v. Beck confirms this line of reasoning.  In that case, as here, the defendant's claim originally seemed foreclosed by extant precedent.  After the issuance of a favorable decision, however, he sought to collaterally attack his sentence, invoking a provision equivalent to (f)(2).  Minter contended that the newly issued decision, by nullifying the unfavorable precedent that had previously barred his claim, served to remove an "impediment" to filing.  After rejecting this argument, the court held that equitable tolling was inappropriate.  Minter, 230 F.3d at 666-67.  The court reasoned that unfavorable precedent may have rendered a timely claim unsuccessful, but did not actually bar Minter from making the attempt.  As the court observed, "futility . . . is not a valid justification for filing an untimely" petition.  Id. at 666.  Nothing in Holland undermines this central holding.  The majority's Orwellian declaration that Minter establishes a "bright-line rule" that must be applied on a "case-by-case basis" is contradictory at best, and scornful of precedent at worst.  Maj. Op. at 12.

60

Tellingly, Whiteside makes no allegation that he was unable to file in a timely fashion -- only that doing so would probably have been unsuccessful in light of extant case law.  Indeed, any such allegation would be frivolous given the many defendants who filed suits prior to Simmons asserting the exact same substantive claim that Whiteside now raises, including of course Simmons himself.  See, e.g., United States v. Brandon, 376 F. App'x 343 (4th Cir. 2010) (unpublished per curiam); United States v. Summers, 361 F. App'x 539 (4th Cir. 2010) (unpublished per curiam); United States v. Simmons, 340 F. App'x 141 (4th Cir. 2009) (unpublished per curiam), vacated, 130 S. Ct. 3455 (2010).  These claims were not entirely meritless even under then-existing precedent: the Supreme Court's decision in Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010), and the Sixth Circuit's opinion in United States v. Pruitt, 545 F.3d 416 (6th Cir. 2008), both strongly foreshadowed Simmons.  Equitable tolling should not be applied where, as here, the only impediment to timely filing was the discouragement felt by the petitioner on calculating his odds of success.

Furthermore, Whiteside has failed to demonstrate that "gross injustice" would result should this court deny his request for equitable tolling and find his claim time-barred. See Green v. Johnson, 515 F.3d 290, 304 (4th Cir. 2008) (internal quotation marks omitted).  As explained above and

61

contrary to the majority's assertion, see Maj. Op. at 21, Whiteside's petition for collateral relief fails on the merits for the simple reason that the claimed sentencing error involved nothing more than a miscalculation of the advisory Guidelines range. Despite Whiteside's contentions to the contrary, this type of error does not represent "a fundamental defect which inherently results in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962). For similar reasons, a dismissal of Whiteside's claims on procedural grounds also falls short of constituting a "gross injustice."

Finally, as several circuits have noted, it is quite improper to use the doctrine of equitable tolling to circumvent the express limitations contained in § 2255. See, e.g., Lo, 506 F.3d at 576. Equitable tolling is instead intended to address obstacles to filing not otherwise governed by the statutory provisions. Owens, 235 F.3d at 360. In this case, Whiteside's statutory and equitable arguments both stem from the change in law precipitated by Simmons. Changes in law are governed by (f)(3), which lays out a set of requirements that Whiteside fails to satisfy. To permit Whiteside to "succeed on this recharacterized argument" would thus "usurp the congressionally mandated limits on habeas petitions." Lo, 506 F.3d at 576.

In this case, Simmons came down roughly a year after Whiteside's conviction became final. That may seem a short time

to the majority, but its equitable reasoning applies equally to a long history of three, five, or even ten years, or whenever a change in circuit decisional law or Guidelines interpretation may appear.  This sort of reasoning makes a mockery of Congress's desire to have post-conviction petitions filed when the evidence is not stale or missing altogether.

III.

It has often been noted that one of the casualties of expanded collateral review is the finality of criminal convictions.  The majority pays the kind of lip service to this value that is typical when a principle is about to be disregarded.  See Maj. Op. at 29.  In the majority's eyes, finality is an empty and hollow concept with no meaning comparable to a defendant's rights to relitigation.  But the evisceration of the finality principles imposes costs, and many of these costs are born by the judicial system.  See McCleskey v. Zant, 499 U.S. 467, 491 (1991); United States v. Addonizio, 442 U.S. 178, 184 n.11 (1979); Henry J. Friendly, Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 148-49 (1970).

As the Seventh Circuit emphasized in Hawkins, collateral review of years-old proceedings ties up prosecutorial resources that could otherwise be used to promptly resolve new criminal cases.  See Hawkins v. United States, 706 F.3d 820, 824 (7th

Cir. 2013), supplemented on denial of reh'g, 724 F.3d 915 (7th Cir. 2013), cert. denied, 82 U.S.L.W. 3308 (U.S. Feb. 24, 2014) (No. 13-538). Furthermore, post-conviction petitioners occupy the time of defense counsel who might otherwise turn their valuable but finite energies to a defense when it matters most: at trial. And the ultimate victims of this burdened system are other litigants, civil and criminal, who find the courthouse door clogged by the ever-rising number of post-conviction petitions.

By undermining finality, expansive collateral review also harms our criminal-justice system more broadly. Because endless collateral review keeps convictions and sentences in legal limbo and makes it more doubtful that announced punishment will actually be imposed, it eviscerates the deterrent effect of criminal law. See Teague v. Lane, 489 U.S. 288, 309 (1989) (plurality opinion). For similar reasons, it reduces public confidence in our criminal-justice system, see Addonizio, 442 U.S. at 184 n.11. And it threatens to diminish the quality of judging in the first instance, since, as Professor Bator recognized long ago, there is "nothing more subversive of a judge's sense of responsibility, of the inner subjective conscientiousness which is so essential a part of the difficult and subtle art of judging well, than an indiscriminate acceptance of the notion that all the shots will always be

64

called by someone else." Paul M. Bator, <u>Finality in Criminal Law and Federal Habeas Corpus for State Prisoners</u>, 76 Harv. L. Rev. 441, 451 (1963).

Ultimately, repetitious litigation under the guise of collateral error correction "disparages the entire criminal justice system," <u>McCleskey</u>, 499 U.S. at 492, by undermining a key justification for the existence of final judgments: to give all interested parties -- defendants, victims, and society alike -- closure and a chance to move on and look forward rather than back. As Justice Harlan put it:

> At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to be treated once convicted. If law, criminal or otherwise, is worth having and enforcing, it must at some time provide a definitive answer to the question litigants present or else it never provides an answer at all. Surely it is an unpleasant task to strip a man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.

<u>Mackey v. United States</u>, 401 U.S. 667, 690-91 (1971) (Harlan, J., concurring in the judgments in part and dissenting in part).

At the time Justice Jackson lamented the flood of post-conviction petitions in <u>Brown v. Allen</u>, the federal courts heard approximately 500 state-prisoner habeas petitions a year. 344

U.S. 443, 536 n.8 (1953) (Jackson, J., concurring in the result). In recent years, they have heard close to 20,000 annually, of which fewer than one-half of one percent have succeeded. Joseph L. Hoffmann & Nancy J. King, Justice, Too Much and Too Expensive, N.Y. Times, Apr. 16, 2011, at WK8. Ultimately, "no one in a position to observe the functioning of our byzantine federal-habeas system can believe it an efficient device for separating the truly deserving from the multitude of prisoners pressing false claims." McQuiggin v. Perkins, 133 S. Ct. 1924, 1942-43 (2013) (Scalia, J., dissenting).

Reasonable people may disagree over the proper tradeoff between finality and error correction, but it is not up to judges to supplant Congress's judgment on this point with their own. Above some constitutional crossbar, which most would agree is easily cleared by our current system, Congress alone possesses the power and responsibility to define the contours of federal collateral review. And by Congress's own terms, the proper focus of such review is on whether, in the direct proceedings, there was a "violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). Because Whiteside's sentence was properly imposed according to the undisputed law in force at the time, there was no such violation.

66

When the majority expands the scope of § 2255 in excess of what Congress intended, or excuses Whiteside's untimely petition in clear violation of statutory requirements, it augments its own power at Congress's expense. As is often the case in federal post-conviction review, dissatisfaction with the underlying provisions of the criminal law fuels expansion of what should be a selectively utilized device for collateral attack. Whatever problems may exist in our substantive criminal and sentencing regimes, reform is properly committed to Congress via its constitutional authority, not to judges through the backdoor of collateral review.

Seldom has a court broken more china en route to a result. Certificates of appealability, doctrines of retroactivity, statutes of limitation, pertinent precedents are all disregarded. Law is relegated to the margins. All that need be staked is one's own claim to sole possession of the "truth" and "right." Instead of respecting the limitations that Congress, the Supreme Court, and our precedent have imposed on § 2255, the majority conflates claims that are cognizable only on direct appeal with the sort of fundamental defects that represent the proper focus of § 2255. The Supreme Court has warned against an approach under which

> the writ would become a delayed motion for a new
> trial, renewed from time to time as the legal climate
> changed. . . .    Wise judicial administration of the

67

> federal courts counsels against such [a] course, at least where the error does not trench on any constitutional rights of defendants nor involve the jurisdiction of the trial court.

<u>Sunal v. Large</u>, 332 U.S. 174, 182 (1947).

The majority's approach devalues collateral review by transforming its nature. The Great Writ, upon which § 2255 was modeled, has earned its name not only because of its power, but because, when used properly, it is used sparingly and to correct certain fundamental infractions. Today, the majority renders post-conviction review unrecognizable as compared to its intended role at the Founding: to challenge sentences in violation of a court's "jurisdiction or detention by the Executive without proper legal process." <u>McCleskey</u>, 499 U.S. at 478 (internal citation omitted); <u>see also</u> <u>Swain v. Pressley</u>, 430 U.S. 372, 385-86 (1977) (Burger, C.J., concurring in part and concurring in the judgment).

The Great Writ stands for the fundamental proposition that government too is subject to the given law. Here the government observed the law; it is, sadly, a court that accords no meaning to that fact. How is it that requiring someone to serve a sentence lawfully imposed and constitutionally rendered becomes a "plain injustice" and a "fundamental unfairness"? Maj. Op. at 29. This path vindicates no fundamental liberty. It only transforms collateral review into a double of direct review, a

68

redundant mechanism for routine error correction, deployed to unsettle sentences that were imposed years earlier under governing law, in accordance with unexceptionable procedure, and by a sovereign acting in accordance with its sovereign duty to protect citizens from those who repeatedly violate its criminal laws.

For the aforementioned reasons, and because I view this decision as wholly wrong and deeply damaging to our criminal-justice system, I respectfully dissent.